Justice Ginsburg
delivered the opinion of the Court.
The Federal Employees Health Benefits Act of 1959 (FEHBA), 5 U. S. C. §8901 et seq. (2000 ed. and Supp. III), establishes a comprehensive program of health insurance for federal employees. The Act authorizes the Office of Personnel Management (OPM) to contract with private carriers to offer federal employees an array of health-care plans. See § 8902(a) (2000 ed.). Largest of the plans for which OPM has contracted, annually since 1960, is the Blue Cross Blue Shield Service Benefit Plan (Plan), administered by local Blue Cross Blue Shield companies. This case concerns the proper forum for reimbursement claims when a Plan beneficiary, injured in an accident, whose medical bills have been paid by the Plan administrator, recovers damages (unaided by the carrier-administrator) in a state-court tort action against a third party alleged to have caused the accident.
*683 FEHBA contains a preemption clause, §8902(m)(1), displacing state law on issues relating to “coverage or benefits” afforded by health-care plans. The Act contains no provision addressing the subrogation or reimbursement rights of carriers. Successive annual contracts between OPM and the Blue Cross Blue Shield Association (BCBSA) have obligated the carrier to make “a reasonable effort” to recoup amounts paid for medical care. App. 95, 125. The statement of benefits distributed by the carrier alerts enrollees that all recoveries they receive “must be used to reimburse the Plan for benefits paid.” Id., at 132; see also id., at 146, 152.
The instant case originated when the administrator of a Plan beneficiary’s estate pursued tort litigation in state court against parties alleged to have caused the beneficiary’s injuries. The carrier had notice of the state-court action, but took no part in it. When the tort action terminated in a settlement, the carrier filed suit in federal court seeking reimbursement of the full amount it had paid for the beneficiary’s medical care. The question presented is whether 28 U. S. C. § 1331 (authorizing jurisdiction over “civil actions arising under the ... laws ... of the United States”) encompasses the carrier’s action. We hold it does not.
FEHBA itself provides for federal-court jurisdiction only in actions against the United States. Congress could decide and provide that reimbursement claims of the kind here involved warrant the exercise of federal-court jurisdiction. But claims of this genre, seeking recovery from the proceeds of state-court litigation, are the sort ordinarily resolved in state courts. Federal courts should await a clear signal from Congress before treating such auxiliary claims as “arising under” the laws of the United States.
I
FEHBA assigns to OPM responsibility for negotiating and regulating health-benefits plans for federal employees. See *684 5 U. S. C. § 8902(a). OPM contracts with carriers, FEHBA instructs, “shall contain a detailed statement of benefits offered and shall include such máximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable.” § 8902(d). Pursuant to FEHBA, OPM entered into a contract in 1960 with the BCBSA to establish a nationwide fee-for-service health plan, the terms of which are renegotiated annually. As FEHBA prescribes, the Federal Government pays about 75% of the premiums; the enrollee pays the rest. § 8906(b). Premiums thus shared are deposited in a special Treasury Fund, the Federal Employees Health Benefits Fund, § 8909(a). Carriers draw against the Fund to pay for covered health-care benefits. Ibid.; see also 48 CFR § 1632.170(b) (2005).
The contract between OPM and the BCBSA provides: “By enrolling or accepting services under this contract, [enrollees and their eligible dependents] are obligated to all terms, conditions, and provisions of this contract.” App. 90. An appended brochure sets out the benefits the carrier shall provide, see id., at 89, and the carrier’s subrogation and recovery rights, see id., at 100. Each enrollee, as FEHBA directs, receives a statement of benefits conveying information about the Plan’s coverage and conditions. 5 U. S. C. § 8907(b). Concerning reimbursement and subrogation, matters FEHBA itself does not address, the BCBSA Plan’s statement of benefits reads in part:
“If another person or entity . . . causes you to suffer an injury or illness, and if we pay benefits for that injury or illness, you must agree to the following:
“All recoveries you obtain (whether by lawsuit, settlement, or otherwise), no matter how described or designated, must be used to reimburse us in full for benefits we paid. Our share of any recovery extends only to the amount of benefits we have paid or will pay to you or, if applicable, to your heirs, administrators, successors, or assignees.
*685 “If you do not seek damages for your illness or injury, you must permit us to initiate recovery on your behalf (including the right to bring suit in your name). This is called subrogation.
“If we pursue a recovery of the benefits we have paid, you must cooperate in doing what is reasonably necessary to assist us. You must not take any action that may prejudice our rights to recover.” App. 165.[1]
If the participant does not voluntarily reimburse the Plan, the contract requires the carrier to make a “reasonable effort to seek recovery of amounts ... it is entitled to recover in cases .. . brought to its attention.” Id., at 95, 125. Pursuant to the OPM-BCBSA master contract, reimbursements obtained by the carrier must be returned to the Treasury Fund. See id., at 92, 118-119.
FEHBA contains a preemption provision, which originally provided:
“The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans to the extent that such law or regulation is inconsistent with such contractual provisions.” 5 U. S. C. § 8902(m)(1) (1994 ed.).
*686 To ensure uniform coverage and benefits under plans OPM negotiates for federal employees, see H. R. Rep. No. 95-282, p. 1 (1977), § 8902(m)(1) preempted “State laws or regulations which specify types of medical care, providers of care, extent of benefits, coverage of family members, age limits for family members, or other matters relating to health benefits or coverage,” id., at 4-5 (noting that some States mandated coverage for services not included in federal plans, for example, chiropractic services). In 1998, Congress amended §8902(m)(1) by deleting the words “to the extent that such law or regulation is inconsistent with such contractual provisions.” Thus, under §8902(m)(l) as it now reads, state law — whether consistent or inconsistent with federal plan provisions — is displaced on matters of “coverage or benefits.”
FEHBA contains but one provision addressed to federal-court jurisdiction. That provision vests in federal district courts “original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States founded on this chapter.” §8912. The purpose of this provision — evident from its reference to the Court of Federal Claims — was to carve out an exception to the statutory rule that claims brought against the United States and exceeding $10,000 must originate in the Court of Federal Claims. See 28 U. S. C. § 1346(a)(2) (establishing district courts’ jurisdiction, concurrent with the Court of Federal Claims, over claims against the United States that do not exceed $10,000); see also S. Rep. No. 1654, 83d Cong., 2d Sess., 4-5 (1954) (commenting, with respect to an identical provision in the Federal Employees’ Group Life Insurance Act, 5 U. S. C. § 8715, that the provision “would extend the jurisdiction of United States district courts above the $10,000 limitation now in effect”).
Under a 1995 OPM regulation, suits contesting final OPM action denying health benefits “must be brought against OPM and not against the carrier or carrier’s subcontractors.” 5 CFR § 890.107(c) (2005). While this regulation channels *687 disputes over coverage or benefits into federal court by designating a United States agency (OPM) sole defendant, no law opens federal courts to carriers seeking reimbursement from beneficiaries or recovery from tortfeasors. Cf. 29 U. S. C. § 1132(e)(1) (provision of the Employee Retirement Income Security Act (ERISA) vesting in federal district courts “exclusive jurisdiction of civil actions under this sub-chapter”). And nothing in FEHBA’s text prescribes a federal rule of decision for a carrier’s claim against its insured or an alleged tortfeasor to share in the proceeds of a state-court tort action.
II
Petitioner Empire HealthChoice Assurance, Inc., doing business as Empire Blue Cross Blue Shield (Empire), is the entity that administers the BCBSA Plan as it applies to federal employees in New York State. Respondent Denise Finn McVeigh (McVeigh) is the administrator of the estate of Joseph E. McVeigh (Decedent), a former enrollee in the Plan. The Decedent was injured in an accident in 1997. Plan payments for the medical care he received between 1997 and his death in 2001 amounted to $157,309. McVeigh, on behalf of herself, the Decedent, and a minor child, commenced tort litigation in state court against parties alleged to have caused Decedent’s injuries. On learning that the parties to the state-court litigation had agreed to settle the tort claims, Empire sought to recover the $157,309 it had paid out for the Decedent’s medical care.[2] Of the $3,175,000 for which the settlement provided, McVeigh, in response to Empire’s asserted reimbursement right, agreed to place $100,000 in escrow.
Empire then filed suit in the United States District Court for the Southern District of New York, alleging that Mc *688 Veigh was in breach of the reimbursement provision of the Plan. As relief, Empire demanded $157,309, with no offset for attorney’s fees or other litigation costs McVeigh incurred in pursuing the state-court settlement. McVeigh moved to dismiss on various grounds, among them, lack of subject-matter jurisdiction. See 396 F. 3d 136, 139 (CA2 2005). Answering McVeigh’s motion, Empire urged that the District Court had jurisdiction under 28 U. S. C. § 1331 because federal common law governed its reimbursement claim. In the alternative, Empire asserted that the Plan itself constituted federal law. See 396 F. 3d, at 140. The District Court rejected both arguments and granted McVeigh’s motion to dismiss for want of subject-matter jurisdiction. Ibid.
A divided panel of the Court of Appeals for the Second Circuit affirmed, holding that “Empire’s clai[m] arise[s] under state law.” Id., at 150. FEHBA’s text, the court observed, contains no authorization for carriers “to vindicate [in federal court] their rights [against enrollees] under FEHBAauthorized contracts”; therefore, the court concluded, “federal jurisdiction exists over this dispute only if federal common law governs Empire’s claims.” Id., at 140. Quoting Boyle v. United Technologies Corp., 487 U. S. 500, 507, 508 (1988), the appeals court stated that courts may create federal common law only when “the operation of state law would (1) ‘significantly] conflict’ with (2) ‘uniquely federal interest^].’ ” 396 F. 3d, at 140.
Empire maintained that its contract-derived claim against McVeigh implicated “‘uniquely federal interest^],’” because (1) reimbursement directly affects the United States Treasury and the cost of providing health benefits to federal employees; and (2) Congress had expressed its interest in maintaining uniformity among the States on matters relating to federal health-plan benefits. Id., at 141. The court acknowledged that the case involved distinctly federal interests, but found that Empire had not identified “specific ways in which the operation of state contract law, or indeed of *689 other laws of general application, would conflict materially with the federal policies underlying FEHBA in the circumstances presented.” Id., at 150 (Sack, J., concurring); see id., at 142.
The Court of Appeals next considered and rejected Empire’s argument that FEHBA’s preemption provision, 5 U. S. C. §8902(m)(1), independently conferred federal jurisdiction. 396 F. 3d, at 145-149. That provision, the court observed, is “a limited preemption clause that the instant dispute does not trigger.” Id., at 145. Unlike §8912, which “authorizes] federal jurisdiction over FEHBA-related . . . claims ‘against the United States,’” the court noted, § 8902(m)(1) “makes no reference to a federal right of action [in] or to federal jurisdiction [over]” the contract-derived reimbursement claim here at issue. 396 F. 3d, at 145, and n. 7.
Judge Raggi dissented. Id., at 151. In her view, FEHBA’s preemption provision, § 8902(m)(1), as amended in 1998, both calls for the application of uniform federal common law to terms in a FEHBA plan and establishes federal jurisdiction over Empire’s complaint.
We granted certiorari, 546 U. S. 1085 (2005), to resolve a conflict among lower federal courts concerning the proper forum for claims of the kind Empire asserts. Compare Blue Cross & Blue Shield of Ill. v. Cruz, 396 F. 3d 793, 799-800 (CA7 2005) (upholding federal-jurisdiction), Caudill v. Blue Cross & Blue Shield of N. C., 999 F. 2d 74, 77 (CA4 1993) (same), and Medcenters Health Care v. Ochs, 854 F. Supp. 589, 593, and n. 3 (Minn. 1993) (same), aff’d, 26 F. 3d 865 (CA8 1994), with Goepel v. National Postal Mail Handlers Union, 36 F. 3d 306, 314-315 (CA3 1994) (rejecting federal jurisdiction), and 396 F. 3d, at 139 (decision below) (same).
Ill
Title 28 U. S. C. § 1331 vests in federal district courts “original jurisdiction” over “all civil actions arising under the Constitution, laws, or treaties of the United States.” A *690 case “aris[es] under” federal law within the meaning of § 1331, this Court has said, if “a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff’s right to relief necessarily depends on resolution of a substantial question of federal law.” Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U. S. 1, 27-28 (1983).
Empire and the United States, as amicus curiae, present two principal arguments in support of federal-question jurisdiction. Emphasizing our opinion in Jackson Transit Authority v. Transit Union, 457 U. S. 15, 22 (1982), and cases cited therein, they urge that Empire’s complaint raises a federal claim because it seeks to vindicate a contractual right contemplated by a federal statute, a right that Congress intended to be federal in nature. See Brief for Petitioner 14-31; Brief for United States 12-23. FEHBA’s preemption provision, Empire and the United States contend, demonstrates Congress’ intent in this regard. The United States argues, alternatively, that there is federal jurisdiction here, as demonstrated by our recent decision in Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U. S. 308 (2005), because “federal law is a necessary element of [Empire’s] claim.” Brief for United States 25; accord Brief for Petitioner 41, n. 5. We address these arguments in turn. But first, we respond to the dissent’s view that Empire and the United States have engaged in unnecessary labor, for Clearfield Trust Co. v. United States, 318 U. S. 363 (1943), provides “a basis for federal jurisdiction” in this case. Post, at 702.
A
Clearfield is indeed a pathmarking precedent on the authority of federal courts to fashion uniform federal common law on issues of national concern. See Friendly, In Praise of Erie — and of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 409-410 (1964). But the dissent is mistaken in supposing that the Clearfield doctrine covers this case. *691 Clearfield was a suit by the United States to recover from a bank the amount paid on a Government check on which the payee’s name had been forged. 318 U. S., at 365. Because the United States was the plaintiff, federal-court jurisdiction was solidly grounded. See ibid. (“This suit was instituted ... by the United States . .. , the jurisdiction of the federal District Court being invoked pursuant to the provisions of § 24(1) of the Judicial Code, 28 U. S. C. § 41(1),” now contained in 28 U. S. C. §§ 1332, 1345, 1359). The case presented a vertical choice-of-law issue: Did state law under Erie R. Co. v. Tompkins, 304 U. S. 64 (1938), or a court-fashioned federal rule of decision (federal common law) determine the merits of the controversy? The Court held that “[t]he rights and duties of the United States on commercial paper which it issues are governed by federal rather than [state] law.” 318 U. S., at 366.
In post-Clearfield decisions, and with the benefit of enlightened commentary, see, e. g., Friendly, supra, at 410, the Court has “made clear that uniform federal law need not be applied to all questions in federal government litigation, even in cases involving government contracts,” R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler’s The Federal Courts and the Federal System 700 (5th ed. 2003) (hereinafter Hart and Wechsler).[3] “[T]he prudent course,” we have recognized, is often “to adopt the readymade body of state *692 law as the federal rule of decision until Congress strikes a different accommodation.” United States v. Kimbell Foods, Inc., 440 U. S. 715, 740 (1979).
Later, in Boyle, the Court telescoped the appropriate inquiry, focusing it on the straightforward question whether the relevant federal interest warrants displacement of state law. See 487 U. S., at 507, n. 3. Referring simply to “the displacement of state law,” the Court recognized that prior cases had treated discretely (1) the competence of federal courts to formulate a federal rule of decision, and (2) the appropriateness of declaring a federal rule rather than borrowing, incorporating, or adopting state law in point. The Court preferred “the more modest terminology,” questioning whether “the distinction between displacement of state law and displacement of federal law’s incorporation of state law ever makes a practical difference.” Ibid. Boyle made two further observations here significant. First, Boyle explained, the involvement of “an area of uniquely federal interest . . . establishes a necessary, not a sufficient, condition for the displacement of state law.” Id., at 507. Second, in some cases, an “entire body of state law” may conflict with the federal interest and therefore require replacement. Id., at 508. But in others, the conflict is confined, and “only particular elements of state law are superseded.” Ibid.
The dissent describes this case as pervasively federal, post, at 702, and “the provisions . . . here [as] just a few scattered islands in a sea of federal contractual provisions,” post, at 709. But there is nothing “scattered” about the provisions on reimbursement and subrogation in the OPMBCBSA master contract. See supra, at 684-685. Those provisions are linked together and depend upon a recovery from a third party under terms and conditions ordinarily governed by state law. See infra, at 698.[4] The Court of *693 Appeals, whose decision we review, trained on the matter of reimbursement, not, as the dissent does, on FEHBAauthorized contracts at large. So focused, the appeals court determined that Empire has not demonstrated a “significant conflict... between an identifiable federal policy or interest and the operation of state law.” 396 F. 3d, at 150 (Sack, J., concurring) (quoting Boyle, 487 U. S., at 507); see 396 F. 3d, at 140-141. Unless and until that showing is made, there is no cause to displace state law, much less to lodge this case in federal court.
B
We take up next Empire’s Jackson Transit-derived argument, which is, essentially, a more tailored variation of the theme sounded in the dissent. It is undisputed that Congress has not expressly created a federal right of action enabling insurance carriers like Empire to sue health-care beneficiaries in federal court to enforce reimbursement rights under contracts contemplated by FEHBA. Empire and the United States nevertheless argue that, under our 1982 opinion in Jackson Transit, Empire’s claim for reimbursement, arising under the contract between OPM and the BCBSA, “states a federal claim” because Congress intended all rights and duties stemming from that contract to be “federal in nature.” Brief for United States as Amicus Curiae 12; see Brief for Petitioner 18-29. We are not persuaded by this argument.
The reliance placed by Empire and the United States on Jackson Transit is surprising, for that decision held there was no federal jurisdiction over the claim in suit. The federal statute there involved, § 13(c) of the Urban Mass Transportation Act of 1964 (UMTA), 78 Stat. 307 (then codified at 49 U. S. C. § 1609(c) (1976 ed.)), conditioned a governmental unit’s receipt of federal funds to acquire a privately owned transit company on preservation of collective-bargaining rights enjoyed by the acquired company’s employees. 457 U. S., at 17-18. The city of Jackson, Tennessee, with federal financial assistance, acquired a failing private bus company *694 and turned it into a public entity, the Jackson Transit Authority. Id., at 18. To satisfy the condition on federal aid, the transit authority entered into a “§ 13(c) agreement” with the union that represented the private company’s employees, and the Secretary of Labor certified that agreement as “fair and equitable.” Ibid, (internal quotation marks omitted).
For several years thereafter, the transit authority covered its unionized workers in a series of collective-bargaining agreements. Eventually, however, the Authority notified the union that it would no longer adhere to collective-bargaining undertakings. Id., at 19. The union commenced suit in federal court alleging breach of the § 13(c) agreement and of the latest collective-bargaining agreement. Ibid. This Court determined that the case did not arise under federal law, but was instead “governed by state law [to be] applied in state cour[t].” Id., at 29.
The Court acknowledged in Jackson Transit that “on several occasions [we had] determined that a plaintiff stated a federal claim when he sued to vindicate contractual rights set forth by federal statutes, [even though] the relevant statutes lacked express provisions creating federal causes of action.” Id., at 22 (emphasis added) (citing Machinists v. Central Airlines, Inc., 372 U. S. 682 (1963) (union had a federal right of action to enforce an airline-adjustment-board award included in a collective-bargaining contract pursuant to a provision of the Railway Labor Act); Norfolk & Western R. Co. v. Nemitz, 404 U. S. 37 (1971) (railroad’s employees stated federal claims when they sought to enforce assurances made by the railroad to secure Interstate Commerce Commission approval of a consolidation under a provision of the Interstate Commerce Act); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U. S. 11, 18-19 (1979) (permitting federal suit for rescission of a contract declared void by a provision of the Investment Advisers Act of 1940)). But prior decisions, we said, “d[id] not dictate the result in [the Jackson Transit] case,” for in each case, “the critical factor” in determining “the scope of *695 rights and remedies under a federal statute ... is the congressional intent behind the particular provision at issue.” 457 U. S., at 22.
“In some ways,” the Jackson Transit Court said, the UMTA “seem[ed] to make § 13(c) agreements and collective-bargaining contracts creatures of federal law.” Id., at 23. In this regard, the Court noted, § 13(c)
“demanded] ‘fair and equitable arrangements’ as prerequisites for federal aid; it required] the approval of the Secretary of Labor for those arrangements; it specified] five different varieties of protective provisions that must be included among the § 13(c) arrangements; and it expressly incorporated] the protective arrangements into the grant contract between the recipient and the Federal Government.” Ibid. (quoting 49 U. S. C. § 1609(c) (1976 ed.)).
But there were countervailing considerations. The Court observed that “labor relations between local governments and their employees are the subject of a longstanding statutory exemption from the National Labor Relations Act.” 457 U. S., at 23. “Section 13(c),” the Court continued, “evinced] no congressional intent to upset the decision in the [NLRA] to permit state law to govern the relationships between local governmental entities and the unions representing their employees.” Id., at 23-24. Legislative history was corroborative. “A consistent theme,” the Court found, “[ran] throughout the consideration of § 13(c): Congress intended that labor relations between transit workers and local governments would be controlled by state law.” Id., at 24. We therefore held that the union had come to the wrong forum. Congress had indeed provided for § 13(c) agreements and collective-bargaining contracts stemming from them, but in the Court’s judgment, the union’s proper recourse for enforcement of those contracts was a suit in state court.
*696 Measured against the Court’s discussion in Jackson Transit about when a claim arises under federal law, Empire’s contract-derived claim for reimbursement is not a “creatur[e] of federal law.” Id., at 23. True, distinctly federal interests are involved. Principally, reimbursements are credited to a federal fund, and the OPM-BCBSA master contract could be described as “federal in nature” because it is negotiated by a federal agency and concerns federal employees. See supra, at 683-684. But, as in Jackson Transit, countervailing considerations control. Among them, the reimbursement right in question, predicated on a FEHBA-authorized contract, is not a prescription of federal law. See supra, at 684. And, of prime importance, “Congress considered jurisdictional issues in enacting FEHBA[,] . . . conferring] federal jurisdiction where it found it necessary to do so.” 396 F. 3d, at 145, n. 7.
FEHBA’s jurisdictional provision, 5 U. S. C. § 8912, opens the federal district-court door to civil actions “against the United States.” See supra, at 686. OPM’s regulation, 5 CFR §890.107(c) (2005), instructs enrollees who seek to challenge benefit denials to proceed in court against OPM “and not against the carrier or carrier’s subcontractors.” See ibid. Read together, these prescriptions “ensur[e] that suits brought by beneficiaries for denial of benefits will land in federal court.” 396 F. 3d, at 145, n. 7. Had Congress found it necessary or proper to extend federal jurisdiction further,, in particular, to encompass contract-derived reimbursement claims between carriers and insured workers, it would have been easy enough for Congress to say so. Cf. 29 U. S. C. § 1132(a)(3) (authorizing suit in federal court “by a participant, beneficiary, or fiduciary” of a pension or health plan governed by ERISA to gain redress for violations of “this subchapter or the terms of the plan”). We have no warrant to expand Congress’ jurisdictional grant “by judicial decree.” See Kokkonen v. Guardian Life Ins. Co. of America, 511 U. S. 375, 377 (1994).
*697 Jackson Transit, Empire points out, referred to decisions “demonstrating] that . . . private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes.” 457 U. S., at 22. See Brief for Petitioner 15. This case, however, involves no right created by federal statute. As just reiterated, while the OPM-BCBSA master contract provides for reimbursement, FEHBA’s text itself contains no provision addressing the reimbursement or subrogation rights of carriers.
Nor do we read 5 U. S. C. § 8902(m)(l), FEHBA’s preemption prescription, see supra, at 685-686, as a jurisdiction-conferring provision. That choice-of-law prescription is unusual in that it renders preemptive contract terms in health insurance plans, not provisions enacted by Congress. See 396 F. 3d, at 143-145; id., at 151 (Sack, J., concurring). A prescription of that unusual order warrants cautious interpretation.
Section 8902(m)(1) is a puzzling measure, open to more than one construction, and no prior decision seems to us precisely on point. Reading the reimbursement clause in the master OPM-BCBSA contract as a condition or limitation on “benefits” received by a federal employee, the clause could be ranked among “[contract] terms ... relating] to ... coverage or benefits” and “payments with respect to benefits,” thus falling within § 8902(m)(1)’s compass. See Brief for United States as Amicus Curiae 20; Reply Brief 8-9. On the other hand, a claim for reimbursement ordinarily arises long after “coverage” and “benefits” questions have been resolved, and corresponding “payments with respect to benefits” have been made to care providers or the insured. With that consideration in view, §8902(m)(1)’s words may be read to refer to contract terms relating to the beneficiary’s entitlement (or lack thereof) to Plan payment for certain healthcare services he or she has received, and not to terms relating to the carrier’s postpayments right to reimbursement. See Brief for Julia Cruz as Amicus Curiae 10,11.
*698 To decide this case, we need not choose between those plausible constructions. If contract-based reimbursement claims are not covered by FEHBA’s preemption provision, then federal jurisdiction clearly does not exist. But even if FEHBA’s preemption provision reaches contract-based reimbursement claims, that provision is not sufficiently broad to confer federal jurisdiction. If Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear. Cf. Columbus v. Ours Garage & Wrecker Service, Inc., 536 U. S. 424, 432-433 (2002) (citing Wisconsin Public Intervenor v. Mortier, 501 U. S. 597, 605 (1991)). Congress has not done so here.
Section 8902(m)(1)’s text does not purport to render inoperative any and all state laws that in some way bear on federal employee-benefit plans. Cf. 29 U. S. C. § 1144(a) (portions of ERISA “supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan”). And, as just observed, see supra, at 697, given that §8902(m)(1) declares no federal law preemptive, but instead, terms of an OPM-BCBSA negotiated contract, a modest reading of the provision is in order. Furthermore, a reimbursement right of the kind Empire here asserts stems from a personal-injury recovery, and the claim underlying that recovery is plainly governed by state law. We are not prepared to say, based on the presentations made in this case, that under § 8902(m)(l), an OPM-BCBSA contract term would displace every condition state law places on that recovery.
As earlier observed, the BCBSA Plan’s statement of benefits links together the carrier’s right to reimbursement from the insured and its right to subrogation. See supra, at 684-685. Empire’s subrogation right allows the carrier, once it has paid an insured’s medical expenses, to recover directly from a third party responsible for the insured’s injury or *699 illness. See 16 G. Couch, Cyclopedia of Insurance Law § 61:1 (2d ed. 1982). Had Empire taken that course, no access to a federal forum could have been predicated on the OPMBCBSA contract right. The tortfeasors’ liability, whether to the insured or the insurer, would be governed not by an agreement to which the tortfeasors are strangers, but by state law, and § 8902(m)(1) would have no sway.
In sum, the presentations before us fail to establish that §8902(m)(1) leaves no room for any state law potentially bearing on federal employee-benefit plans in general, or carrier-reimbursement claims in particular. Accordingly, we extract from §8902(m)(1) no prescription for federal-court jurisdiction.
C
We turn finally to the argument that Empire’s reimbursement claim, even if it does not qualify as a “cause of action created by federal law,” nevertheless arises under federal law for § 1331 purposes, because federal law is “a necessary element of the [carrier’s] claim for relief.” Brief for United States as Amicus Curiae 25-26 (quoting Grable, 545 U. S., at 312, and Jones v. R. R. Donnelley & Sons Co., 541 U. S. 369, 376 (2004)). This case, we are satisfied, does not fit within the special and small category in which the United States would place it. We first describe Grable, a recent decision that the United States identifies as exemplary,[5] and then explain why this case does not resemble that one.
Grable involved real property belonging to Grable & Sons Metal Products, Inc. (Grable), which the Internal Revenue Service (IRS) seized to satisfy a federal tax deficiency. 545 U. S., at 310. Grable received notice of the seizure by certified mail before the IRS sold the property to Darue Engineering & Manufacturing (Darue). Ibid. Five years later, *700 Grable sued Darue in state court to quiet title. Grable asserted that Darue’s record title was invalid because the IRS had conveyed the seizure notice improperly. Id., at 311. The governing statute, 26 U. S. C. § 6335(a), provides that “notice in writing shall be given ... to the owner of the property ... or shall be left at his usual place of abode or business . . . .” Grable maintained that § 6335(a) required personal service, not service by certified mail. 545 U. S., at 311.
Darue removed the case to federal court. Alleging that Grable’s claim of title depended on the interpretation of a federal statutory provision, i. e., § 6335(a) of the Internal Revenue Code, Darue invoked federal-question jurisdiction under 28 U. S. C. § 1331. We affirmed lower court determinations that the removal was proper. “The meaning of the federal tax provision,” we said, “is an important issue of federal law that sensibly belongs in a federal court.” 545 U. S., at 315. Whether Grable received notice adequate under § 6335(a), we observed, was “an essential element of [Grable’s] quiet title claim”; indeed, “it appeared] to be the only . .. issue contested in the case.” Ibid.
This case is poles apart from Grable. Cf. Brief for United States as Amicus Curiae 27. The dispute there centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as “substantial,” and its resolution was both dispositive of the case and would be controlling in numerous other cases. See 545 U. S., at 313. Here, the reimbursement claim was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, see supra, at 687-688, and the bottom-line practical issue is the share of that settlement properly payable to Empire.
Grable presented a nearly “pure issue of law,” one “that could be settled once and for all and thereafter would govern numerous tax sale cases.” Hart and Wechsler 65 (2005 Supp.). In contrast, Empire’s reimbursement claim, Me *701 Veigh’s counsel represented without contradiction, is fact-bound and situation-specific. McVeigh contends that there were overcharges or duplicative charges by care providers, and seeks to determine whether particular services were properly attributed to the injuries caused by the 1997 accident and not rendered for a reason unrelated to the accident. See Tr. of Oral Arg. 44, 53.
The United States observes that a claim for reimbursement may also involve as an issue “[the] extent, if any, to which the reimbursement should take account of attorney’s fees expended ... to obtain the tort recovery.” Brief as Amicus Curiae 29. Indeed it may. But it is hardly apparent why a proper “federal-state balance,” see id., at 28, would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum. The state court in which the personal-injury suit was lodged is competent to apply federal law, to the extent it is relevant, and would seem best positioned to determine the lawyer’s part in obtaining, and his or her fair share in, the tort recovery.
The United States no doubt “has an overwhelming interest in attracting able workers to the federal workforce,” and “in the health and welfare of the federal workers upon whom it relies to carry out its functions.” Id., at 10. But those interests, we are persuaded, do not warrant turning into a discrete and costly “federal case” an insurer’s contract-derived claim to be reimbursed from the proceeds of a federal worker’s state-court-initiated tort litigation.
In sum, Grable emphasized that it takes more than a federal element “to open the 'arising under’ door.” 545 U. S., at 313. This case cannot be squeezed into the slim category Grable exemplifies.
* * *
For the reasons stated, the judgment of the Court of Appeals for the Second Circuit is

Affirmed.

 The statement of benefits further provides:
“You must tell us promptly if you have a claim against another party for a condition that we have paid or may pay benefits for, and you must tell us about any recoveries you obtain, whether in or out of court. We may seek a lien on the proceeds of your claim-in order to reimburse ourselves to the full amount of benefits we have paid or will pay.
“We may request that you assign to us (1) your right to bring an action or (2) your right to the proceeds of a claim for your illness or injury. We may delay processing of your claims until you provide the assignment.
“Note: We will pay the costs of any covered services you receive that are in excess of any recoveries made.” App. 165.

 At oral argument, counsel for respondent McVeigh represented that “most of the [reimbursement claims] are not of th[is] magnitude”; “[m]ost of the cases involve [amounts like] $5,500 and $6,500.” Tr. of Oral Arg. 52.

 The United States, in accord with the dissent in this regard, see post, at 707, several times cites United States v. County of Allegheny, 322 U. S. 174 (1944), see, e. g., Brief as Amicus Curiae 10, 15, 26, maintaining that the construction of a federal contract “necessarily presentís] questions of ‘federal law not controlled by the law of any State,’ ” id., at 26 (quoting 322 U. S., at 183). Allegheny does not stretch as widely as the United States suggests. That case concerned whether certain property belonged to the United States and, if so, whether the incidence of a state tax was on the United States or on a Government contractor. See id., at 181-183, 186-189. Neither the United States nor any United States agency is a party to this ease, and the auxiliary matter here involved scarcely resembles the controversy in Allegheny.

 The dissent nowhere suggests that uniform, court-declared federal law would govern the carrier’s subrogation claim against the tortfeasor. Nor does the dissent explain why the two linked provisions — reimbursement and subrogation — should be decoupled.

 As the Court in Grable observed, 545 U. S., at 312, the classic example of federal-question jurisdiction predicated on the centrality of a federal issue is Smith v. Kansas City Title & Trust Co., 255 U. S. 180 (1921).