KAREN NELSON MOORE, Circuit Judge,
concurring in the judgment.
I concur in the majority’s conclusions that (1) removal of this action to federal court was proper, (2) issue preclusion bars the instant suit because the identical issue of whether plaintiffs’ claims are derivative or direct was litigated and decided in a *757 previous suit between the parties, and (3) even if issue preclusion did not apply, the plaintiffs’ claims are derivative under Tennessee law and the plaintiffs have failed to comply with the demand requirement for derivative suits. I write separately to explain my disagreement with the majority on the proper basis for removal of this action to federal court and to explain my reasoning on the other issues in detail.
I. FEDERAL-QUESTION JURISDICTION
The majority concludes that there is federal-question jurisdiction over the plaintiffs’ claims on two alternate grounds: (1) the plaintiffs have actually pleaded a federal cause of action, or (2) the plaintiffs’ claims present a substantial question of federal law. I respectfully disagree. First, the majority suggests that the plaintiffs have actually pleaded a federal cause of action based on the fact that the complaint uses the language “pursuant to FE-TRA.” See, e.g., Joint Appendix (“J.A.”) at 58 (Compl.ffl 73-75). However, under the well-pleaded-complaint rule, “[t]o determine whether the claim arises under federal law, we examine the ‘well pleaded’ allegations of the complaint and ignore potential defenses.” Beneficial Nat’l Bank v. Anderson, 539 U.S. 1, 6, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003). Here, each of the plaintiffs’ seven claims are explicitly pleaded as state-law claims. One exception to the well-pleaded-complaint rule is the artful-pleading doctrine, which provides that plaintiffs may not avoid removal by artfully pleading essentially federal-law claims as state-law claims. Federated Dep’t Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). That exception, however, does not apply here. The Fair and Equitable Tobacco Reform Act of 2004 (“FETRA”) does not include a civil-suit provision, nor do the parties suggest that it implies a private right of action. Given that there is no federal claim that might have been asserted by the plaintiffs, it is clear that the plaintiffs did not artfully draft their complaint to avoid invoking a federal statute as the basis for them claims.
■ I also cannot agree with the majority’s conclusion that there is federal “arising under” jurisdiction over the plaintiffs’ state-law claims under the substantial-federal-question doctrine. “Under the substantial-federal-question doctrine, a state law cause of action may actually arise under federal law, even though Congress has not created a private right of action, if the vindication of a right under state law depends on the validity, construction, or effect of federal law.” Mikulski v. Centerior Energy Corp., 501 F.3d 555, 565 (6th Cir.2007) (en banc), cert. denied, — U.S. -, 128 S.Ct. 2426, 171 L.Ed.2d 229 (2008). The Supreme Court has explained that federal-question jurisdiction exists over a state-law claim only if that claim “necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.” Grable & Sons Metal Prods., Inc., v. Darue Eng’g & Mfg., 545 U.S. 308, 314, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005); see also Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006) (applying Grable). We have summarized the requirements for federal-question jurisdiction under Grable as follows: “(1) the state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; (3) the exercise of jurisdiction must not disturb any congressionally approved balance of federal and state judicial responsibilities.” Mikulski, 501 F.3d at 568 (citing Grable, 545 U.S. at 314, 125 S.Ct. 2363).
*758 None of the plaintiffs’ claims appear to raise necessarily a disputed federal issue. Defendant Burley Stabilization Corporation (“BSC”) primarily points to language in the plaintiffs’ complaint stating that “[pjursuant to the FETRA, the producer/members of the BSC are entitled to a distribution of the net proceeds from the sale of the loan pool tobacco.” J.A. at 58 (ComplJ 75) (emphasis added). At first glance this appears to present a federal issue. However, a closer look at FETRA and the plaintiffs’ complaint indicates that FETRA does not speak to this issue and that the cited language was probably an unintended drafting error by the plaintiffs. It is undisputed that pursuant to FETRA the Commodity' Credit Corporation (“CCC”) released some 16.1 million pounds of tobacco to BSC in 2005. The plaintiffs contend that BSC now must distribute the net proceeds from the sale of that tobacco (the “FETRA tobacco”) to its members (i.e., the putative plaintiff class). Although the language cited above suggests that the plaintiffs assert their interest in the FE-TRA tobacco based on FETRA, this is not the case. The plaintiffs have repeatedly maintained that their right to a distribution of these proceeds rests solely on state-law grounds. Moreover, nothing in FE-TRA speaks to the issue of whether a grower association must distribute to its members the proceeds it receives when it sells the tobacco released to it by the CCC pursuant to FETRA. As part of the winding-up of the federal-tobacco-support program, FETRA directs the CCC to transfer certain loan-pool tobacco to associations for their disposal. See 7 U.S.C. § 519(b). However, FETRA is simply silent on what an association must do with the proceeds from the sale of that tobacco, and, not surprisingly, BSC points to no specific provision of FETRA that speaks to this issue. Because FETRA does not control the disputed question of whether BSC must distribute proceeds from the FETRA tobacco to the plaintiffs, I believe that the majority errs in premising federal-question jurisdiction on FETRA.
BSC also contends that there is a substantial federal question involving the interpretation of a provision of the federal No Net Cost Tobacco Program Act, 7 U.S.C. §§ 1445-1 to -2 (repealed 2004) (“1982 Tobacco Act”). The plaintiffs’ complaint alleges that pursuant to the Tennessee Cooperative Marketing Law and Tennessee common law, BSC must distribute to its members (i.e., the putative plaintiff class) the net profits that BSC realized from the sale of certain tobacco from the 1983-2004 pool crops. The plaintiffs allege that “the CCC released its interest in certain tobacco pledged as security for the 1983-2004 crop year loans and any proceeds received by the BSC from the sale of the tobacco collateral.” J.A. at 61 (Comply 90). Consequently, according to the plaintiffs, the BSC realized profits on the sale of that tobacco “free and clear of any claim or interest of the CCC” and should have distributed those profits to its members. Id. BSC counters that “this claim is completely erroneous because, at all times relevant, the 1982 Tobacco Act mandated that CCC ‘shall retain the net gains from each of the 1982 and subsequent crops’ to offset past and future tobacco program losses.” BSC Br. at 32-33 n. 18 (quoting 7 U.S.C. § 1445-l(d)(5)). According to BSC, this presents a federal issue sufficient to confer jurisdiction under the substantial-federal-question doctrine. However, BSC’s invocation of this provision is properly characterized as a federal defense to the plaintiffs’ state-law claims. Under the well-pleaded complaint rule, “ [t]o determine whether the claim arises under federal law, we examine the “well pleaded’ allegations of the complaint and ignore potential defenses.” Anderson, 539 U.S. at 6, 123 S.Ct. 2058. “ ‘[A] suit arises under the Constitution and laws of the *759 United States only when the plaintiffs statement of his own cause of action shows that it is based upon those laws or that Constitution.’ ” Id. (quoting Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908) (alteration in Anderson)). Here, the plaintiffs base their claims entirely on Tennessee law and do not assert claims based on the 1982 Tobacco Act.[2] Instead, it is BSC that asserts the 1982 Tobacco Act as a federal defense to the plaintiffs’ state-law claims. Only in limited circumstances and under specialized jurisdictional statutes may removal be based on a federal defense. I now turn to one of those specialized statutes: the federal officer removal statute, 28 U.S.C. § 1442.
II. FEDERAL OFFICER REMOVAL STATUTE
As an alternative ground for removal, BSC asserts that it was entitled to remove the action to federal court pursuant to the federal officer removal statute.[3] I would affirm the district court’s determination that removal was proper on this alternative ground. The statute “permits removal only if [BSC], in carrying out the ‘act[s]’ that are the subject of the [plaintiffs’] complaint, was ‘acting under’ any ‘agency’ or ‘officer’ of ‘the United States.’ ” Watson v. Philip Morris Cos., 551 U.S. 142, 127 S.Ct. 2301, 2304, 168 L.Ed.2d 42 (2007) (quoting 28 U.S.C. § 1442(a)(1) (second alteration in original)). Further, a defendant seeking removal under the statute must allege a “colorable federal defense.” Mesa v. California, 489 U.S. 121, 129, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). Because BSC (like other grower associations) played a special role in the administration of the federal government’s tobacco-price-support program, the acts complained of by plaintiffs relate to the administration of that program, and BSC asserts a colorable federal defense, I believe that the action is removable under § 1442.
First, I believe that B SC meets the requirement that it was “acting under” a federal “officer” or “agency.” The Supreme Court recently clarified the circumstances under which a private firm may fall within the scope of statutory requirement of “acting under” a federal official or agency. See Watson, 127 S.Ct. 2301. In Watson, the Court rejected the cigarette manufacturer Philip Morris’s contention that it was “acting under” federal officers based upon the high level of federal regulation of the company’s operations and the fact that it conducted laboratory testing of cigarettes under the close supervision of the Federal Trade Commission, a federal agency. The Court began by explaining that “acting under” implies a relationship that “typically involves ‘subjection, guidance, or control.’” Id. at 2307 (quoting Webster’s New International Dictionary 2765 (2d ed. 1953)). It fuither noted that “the private person’s ‘acting under’ must involve an effort to assist, or to help carry out, the duties or tasks of the federal *760 ■ superior.” Id. Turning to Philip Morris’s contention that the detailed federal regulation and supervision it received brought the company within the statutory requirement that it be “acting under” a federal “official,” the Court concluded that “[a] private firm’s compliance or (noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase ‘acting under’ a federal ‘official.’ ” Id. at 2808. The Court noted that “[a] contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court. actions filed against private firms in many highly regulated industries.” Id.
In rejecting Philip Morris’s invocation of the statute, the Court distinguished the case from lower court cases holding that “Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision.” Id. (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir.1998), cert. denied, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999)). The Court explained that, unlike Philip Morris, the government contractors in those cases provided assistance that went “beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks.” Id. For instance, in Winters the government contractor, Dow Chemical, “fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war.” Id. Thus, the government contractors in those cases “performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.” Id.
I believe that the special role played by grower associations such as BSC in helping to administer the federal tobacco-price-support program brings BSC within the scope of the statutory requirement that it was “acting under” a federal “officer.” The 1982 Tobacco Act was intended “to limit federal tobacco expenditures to administrative costs.” Leaf Tobacco Exporters Ass’n, Inc. v. Block, 749 F.2d 1106, 1109 (4th Cir.1984). In other words, it aimed to relieve taxpayers of the burden of supporting the program. To accomplish this goal, the Act required BSC and other grower associations to establish either a No Net Cost Tobacco Fund, 7 U.S.C. § 1445-1 (repealed 2004), or a No Net Cost Tobacco Account within the CCC, 7 U.S.C. § 1445-2 (repealed 2004), the latter of which was evidently established by BSC. The purpose of a No Net Cost Tobacco Account (“Account”) was to ensure that the CCC- — and therefore the taxpayers — suffered no net losses on the loans that the CCC made to associations on the 1982 tobacco crop and all later crops. Id. § 1445-2(e). Generally speaking, an Account had two different sources of funding. First, producers and purchasers of loan-pool tobacco were required to pay assessments into the Account on each pound of tobacco sold or purchased at rates set by the Secretary of Agriculture. Id. § 1445-2(d). When a producer delivered tobacco to an association, the association was required to collect the assessment from the producer and pay it into the association’s Account at the CCC. 7 C.F.R. § 1464.10(i)(l)(iii) (removed 2005). Second, if an association such as BSC realized more revenue from the sale of a particular year’s crop than necessary to repay the CCC on loans related to that crop, those profits, or “Net Gains,” were also transferred to the Account. 7 U.S.C. §§ 1445-1(d)(5), 1445-2(h) (both repealed 2004). Consistent with this requirement, BSC asserts that the Net Gains on the sales of the 1983-2004 crops “were transferred to *761 BSC’s no Net Cost Account as they accrued.” BSC Br. at 19 n. 9. By collecting assessments from producers and by transferring the profits on the sales of each crop to an Account at the CCC, the BSC and other grower associations played an integral role in administering the tobacco-price-support program and ensuring, after 1982, that taxpayers would be relieved of the costs of the program.
Department of Agriculture regulations implementing the 1982 Tobacco Act further illustrate that grower associations such as BSC were charged with helping to administer the revised tobacco-price-support program under the guidance and supervision of the CCC, a federal agency. The regulations provided that the program would be “carried out by cooperative marketing associations ... acting on behalf of them producer members,” but would be “under the general direction and supervision of the ... CCC.” 7 C.F.R. § 1464.1(a) (removed 2005). Thus, grower associations such as BSC generally carried out this government program, but the CCC directed and supervised how they did so. For instance, the CCC exercised detailed supervision and control over the contracts that associations such as BSC made to sell loan-pool tobacco. When an association contracted with a tobacco-auction warehouse to sell loan-pool tobacco, the contract was required to be “on a form of agreement approved by CCC.” Id. § 1464.2(b)(1)(f). Further, when the CCC believed that a particular tobacco-auction warehouse would not honor its obligations under a contract with an association, the “CCC reserve[d] the right to direct the association to withhold a contract under the price support program” from that warehouse. Id. § 1464.2(b)(l)(iii).
Like the government contractors that have invoked successfully the federal officer removal statute in other courts, e.g., Winters, 149 F.3d 387,1 believe that grower associations such as BSC provided assistance to the government that went “beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks.” Watson, 127 S.Ct. at 2308. Under the general direction and supervision of the CCC, BSC and other associations played a crucial role in administering the program under the 1982 Tobacco Act by, among other things, collecting assessments from producers and remitting Net Gains from the sale of loan-pool tobacco to accounts maintained at the CCC, furthering the statute’s goal that the program would have no net cost for taxpayers. In so doing, BSC and other associations “performed a job that,” in their absence, “the Government itself would have had to perform.” Id. Accordingly, I believe that BSC falls within the ambit of the statutory phrase “acting under” a federal “officer.” 28 U.S.C. § 1442(a)(1).
To come within the scope of the statute, BSC must also have carried out the acts that are the subject of the plaintiffs’ complaint while acting under a federal officer. See Watson, 127 S.Ct. at 2304. Further, BSC must allege a “colorable federal defense.” Mesa, 489 U.S. at 129, 109 S.Ct. 959. I believe that these additional requirements are satisfied. As discussed above, the plaintiffs allege that BSC improperly retained the net profits from the sale of the 1983-2004 loan-pool tobacco instead of distributing those profits to its members. The plaintiffs contend that because the CCC released to BSC any interest in certain tobacco for those crop years, the BSC realized profits on the sale of that tobacco “free and clear of any claim or interest of the CCC” and should have distributed those profits to its members. J.A. at 61 (Comply 90). BSC’s defense is that it was required to remit those profits to its No Net Cost Tobacco Account at CCC because “the 1982 Tobacco Act mandated that CCC ‘shall retain the net gains *762 from each of the 1982 and subsequent crops’ to offset past and future tobacco program losses.” BSC Br. at 32-33 n. 18 (quoting 7 U.S.C. § 1445-l(d)(5)). At least on BSC’s theory of the case, BSC performed the acts complained of by the plaintiffs pursuant to its administrative obligations under the 1982 Tobacco Act and in accord with its agreements with the CCC. Similarly, BSC raises a “colorable federal defense” because it asserts that it was required by the 1982 Tobacco Act to remit the Net Gains on the sale of the 1983-2004 loan-pool tobacco to its Account at CCC and could not have distributed the Net Gains to its members. The plaintiffs apparently contend that the loan-pool tobacco at issue was not subject to the Act’s requirement that Net Gains be remitted to the CCC Account. But that merely raises a fact question, and at this point BSC “need not prove the asserted defense, but need only articulate its ‘colorable’ applicability to the plaintiff[s’] claims.” Winters, 149 F.3d at 400; see also Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (“The officer need not win his case before he can have it removed.”).
Because I believe that BSC is within the scope of the federal officer removal statute, I would affirm the district court’s ruling that removal was proper on this alternative ground.
III. ISSUE PRECLUSION
I agree with the majority that issue preclusion (collateral estoppel) bars reliti-gation of the issue of whether plaintiffs’ claims are derivative. As the majority explains, this issue was actually litigated and decided by the district court in a virtually identical prior action brought by the plaintiffs.[4] In the first suit, filed in state court and later removed to federal court, the district court adopted an earlier ruling of the state court that the plaintiffs’ claims against BSC were derivative under Tennessee law and dismissed those claims without prejudice because the plaintiffs had neither satisfied the demand requirement under Tennessee law nor shown that a demand would have been futile. In this second suit, six of the seven claims asserted against BSC are identical to claims asserted in the first suit. Only Count 1 in the instant suit is nominally different. The plaintiffs styled Count 1 in the first suit as a breach of fiduciary duty by current and former officers and directors of the BSC and requested distribution of funds in the BSC’s No Net Cost Tobacco Account and proceeds from the sale of the FETRA tobacco. Count 1 in this suit is styled as a declaratory judgment action against BSC seeking a declaration that the members of the BSC are entitled to a distribution of the proceeds from the sale of the FETRA tobacco. Notwithstanding the change in the legal label put on Count 1, I agree with the majority’s conclusion that the issue of derivative standing presented in the two suits is identical and that the district court’s ruling in the first suit that the plaintiffs’ claims are derivative is entitled to issue preclusive effect.
In the first suit, the district court dismissed the plaintiffs’ claims without prejudice, so that the plaintiffs could reassert the same claims against BSC by curing the defects that led to the dismissal, i.e., by satisfying the demand requirement which is a precondition for derivative actions under Tennessee law. Because the plaintiffs did not cure this defect and instead simply modestly repackaged the same claims as *763 serted in the first suit, the district court in the instant (second) suit again dismissed the plaintiffs’ claims without prejudice, ruling that issue preclusion barred relitigation of the issue of derivative standing. Issue preclusion is appropriate here because the plaintiffs could have appealed the district court’s ruling in the first suit that their claims against BSC were derivative.[5] When a district court “dismiss[es] ... a complaint, as opposed to an action, without prejudice” that “is not a final and appealable order.” Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 845 (6th Cir.2007); see Azar v. Conley, 480 F.2d 220, 223 (6th Cir.1973) (same). However, when “the district court dismisses an action without prejudice, ... the order is final and appealable.” Morgan Stanley, 485 F.3d at 845 (internal quotation marks omitted). Here, in the first suit, the district court issued, along with its memorandum and order of March 14, 2007, a final judgment dismissing all of the plaintiffs’ claims against BSC “without prejudice” and dismissing the action in its entirety, not just the plaintiffs’ complaint. This was clearly an appealable final judgment. The plaintiffs had an opportunity to appeal the district court’s determination that their claims against BSC are derivative, but they declined to do so.
Because the issue of derivative standing was actually litigated and decided in the first suit and necessary to the resolution of the first suit, and because the plaintiffs had an opportunity to appeal that ruling, I agree with the majority that issue preclusion bars relitigation of this issue.
IV. DERIVATIVE NATURE OF CLAIMS
Finally, I agree with the majority that even if issue preclusion did not apply, the plaintiffs’ claims are derivative under Tennessee law and therefore the district court properly dismissed the action for failure to comply with the demand requirement. Our opinion in McCarthy v. Middle Tennessee Electric Membership Corp., 466 F.3d 399, 407-10 (6th Cir.2006), makes it clear that Tennessee law governs whether the plaintiffs’ claims are derivative or direct. Like McCarthy, the instant case essentially involves claims of “mismanagement, self-dealing, and breach of fiduciary duty.” 466 F.3d at 410 (internal quotation marks omitted). In essence, the plaintiffs maintain that BSC, a nonprofit agricultural cooperative, improperly failed to distribute to its members proceeds from sales of certain loan-pool tobacco as required by the Tennessee Cooperative Marketing Law and various common-law theories. I believe that this case is indistinguishable from McCarthy and the Tennessee Supreme Court’s decision in Davis v. Appalachian Electric Co-operative, Inc., 213 Tenn. 215, 373 S.W.2d 450 (1963), where similar claims for accountings and distributions of cooperative funds were classified as derivative rather than direct.

. The plaintiffs do refer the 1982 Tobacco Act in their complaint. See, e.g., J.A. at 58 (Compl.Hfl 71-73). However, these references simply provide background and do not form the basis for any of the plaintiffs’ claims.

. The federal officer removal statute provides in relevant part:
A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending ... [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.
28U.S.C. § 1442(a)(1).

. In the first suit, the CCC as well as various officers and directors of the BSC were also named as defendants, whereas in the instant suit the plaintiffs name only BSC as a defendant. However, the allegations and claims against BSC in the two suits are virtually identical.

. By contrast, when an issue is not appeal-able, issue preclusion does not apply. See Dixon v. Wallowa County, 336 F.3d 1013, 1020 (9th Cir.2003) (“Issue preclusion does not apply to an issue that is not appealable.”); Restatement (Second) of Judgments § 28(1) (1982) (stating that issue preclusion does not apply when “[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action”).