**D.B. ZWIRN SPECIAL OPPORTU-NITIES FUND, L.P., Plaintiff,**

v.

**TAMA BROADCASTING, INC., Tama Radio Licenses of Savannah, Georgia, Inc., Tama Radio Licenses of Tampa, Florida, Inc., and Tama Radio Licenses of Jacksonville, Florida, Inc., Defendants.**

No. 08 Civ. 3125(SAS).

United States District Court, S.D. New York.

April 28, 2008.

Steven Robert Paradise, Esq., Michael S. Davi, Esq., Michael V. Rella, Esq., Vinson & Elkins LLP, NY, for Plaintiff.

David W.R. Wawro, Esq., Ian Michael Goldrich, Esq., Torys LLP, New York, NY, Percy Squire, Esq., Squire & Pierre–Louis LLC, Columbus, OH, for Defendants.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

### I. INTRODUCTION

D.B. Zwirn Special Opportunities Fund, L.P. ("D.B.Zwirn") brings this action against Tama Broadcasting, Inc. ("Tama") and certain of its subsidiaries for breach of contract stemming from Tama's failure to fulfill its payment obligations under financing agreements entered into with plaintiff. Presently pending before the Court is plaintiff's motion by order to show cause for the appointment of a temporary receiver to protect defendants' assets, which serve as collateral to those agreements. For the reasons that follow, the case is remanded to state court *sua sponte* for lack of subject matter jurisdiction.

### II. BACKGROUND

#### A. Facts[1]

D.B. Zwirn is a Delaware limited partnership with its principal place of business in New York.[2] Some of the partners comprising the partnership are Delaware corporations.[3] Tama, a Delaware corporation with its principal place of business in Florida, owns several radio stations in Georgia and Florida.[4] Tama Radio Licenses of Savannah, Georgia, Inc., Tama Radio Li-

---

1. The following facts are taken from the Amended Complaint ("Compl."), and the parties' submissions in support of and in opposition to the pending motion. Plaintiff amended its complaint on April 23, 2008 to name additional defendants. These defendants have not yet had the opportunity to answer the complaint. Because the Court and the parties have an interest in proceeding efficiently and because defendants' answer would not change the outcome, I issue this Opinion and Order without further delay.

2. *See* Compl. ¶ 2.

3. *See* 4/21/08 Letter from Steven Paradise, plaintiff's counsel, to the Court at 1. *See also* Defendant Tama's Notice of Removal ¶¶ 12–14 (stating that plaintiff is a limited partnership, and that plaintiff's "general partner is D.B. Zwirn Partners LLC is a Delaware limited liability company with its principal place of business in New York, New York").

4. *See* Compl. ¶ 3.

censes of Tampa, Florida, Inc., and Tama Radio Licenses of Jacksonville, Florida, Inc. (collectively, the "Tama Subsidiaries") are Florida corporations principally conducting business in that state.[5] They are subsidiaries of Tama and they own certain broadcasting licenses issued by the Federal Communications Commission (the "FCC") that Tama uses to transmit radio programming on its radio stations.[6]

D.B. Zwirn, as sole lender, and Tama, as sole borrower, executed a financing agreement dated March 17, 2004, pursuant to which D.B. Zwirn made a term loan in the aggregate principal amount of $21 million so that Tama could fund certain acquisitions and refinance existing debt (the "Financing Agreement").[7] Simultaneous to the execution of the Financing Agreement, D.B. Zwirn and Tama executed a security agreement, providing that an event of default, as defined in the agreement, would give plaintiff the right to foreclose on those assets that Tama had pledged as collateral for the loan (the "Security Agreement").[8] The Tama Subsidiaries are signatories to the Security Agreement. Under the terms of that agreement, the collateral includes all of defendants' accounts, inventory, investment property, intellectual property, fixtures, all proceeds from the sale of such collateral, and the "FCC licenses only to the extent such assignment or pledge [ ]

would not cause a breach or default under such FCC license or violate any [f]ederal or state law." [9]

On June 30, 2005, the parties executed an amended agreement under which D.B. Zwirn made an additional term loan in the principal amount of $1.5 million (the "Amended Financing Agreement").[10] Under the Amended Financing Agreement, both of plaintiff's loans to Tama were to mature on June 30, 2006.[11]

Tama failed to fulfill its payment obligations under the Financing Agreement and the Amended Financing Agreement.[12] Pursuant to section 2.03(a) of those agreements, Tama became responsible for the entire balance of the unpaid principal and accrued but unpaid interest on June 30, 2006.[13] Despite Tama's failure to make any payments or to fulfill certain of its other obligations, D.B. Zwirn entered into a forbearance agreement with Tana dated January 23, 2007 (the "Forbearance Agreement"). D.B. Zwirn deferred pursuit of its remedies until February 15, 2007, and Tama acknowledged several "events of default" under the Amended Financing Agreement.[14]

Following the termination of the Forbearance Agreement, Tama still had not made any payments or cured any of its "events of default." [15] Instead of pursuing

---

5. *See id.* ¶¶ 4–6.

6. *See id.*

7. *See* Plaintiff's Memorandum of Law in Support of its Request for an Order to Show Cause for the Appointment of a Temporary Receiver ("Pl.Mem.") at 3. *See also* Compl. ¶ 8.

8. *See* Compl. ¶¶ 12–15.

9. 3/17/04 Security Agreement, Ex. B to Affidavit of Peter Leibman Vice President of DBZ Global Advisors LLC, affiliate of plaintiff ("Leibman Aff.") § 2.

10. *See* Compl. ¶ 9.

11. *See id.* ¶ 10.

12. *See id.* ¶ 18.

13. *See* 6/30/05 Amended and Restated Financing Agreement ("Amended Financing Agreement"), Ex. A to Compl., § 2.03(a) ("The outstanding principal of the Term Loans shall be repaid in full on the Final Maturity Date.").

14. *See* Compl. ¶¶ 19–20. *See also* 1/23/07 Forbearance Agreement, Ex. C to Leibman Aff.

15. *See* Compl. ¶ 20.

remedies at that time, plaintiff entered into discussions with Tama to restructure the underlying financial agreements. In connection with the potential restructuring, Bernard Radio LLC, plaintiff's affiliate, entered into a Local Marketing Agreement (the "LMA"), dated September 10, 2007, with Tama.[16] Bernard Radio LLC's subsequently assigned its interest in the LMA to Straight Way Radio LLC ("Straight Way"), another of plaintiff's affiliates.[17] Under the terms of the LMA, which currently remains in effect, Straight Way agreed to purchase broadcasting time on Tama's radio stations for a period of five years.[18]

## B. Contractual Provision on Appointment of Temporary Receiver

Both the Financing Agreement and the Amended Financing Agreement contain language regarding the appointment of a temporary receiver. The pertinent language provides:

> [T]he Agent may, and shall at the request of the Required Lenders, by notice to the Administrative Borrower ... (iv) seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing, subject to 9.02 ... the Transaction Parties further agree to consent to the appointment of a receiver (selected by the Agent and approved by the Required Lenders) by any court of competent jurisdiction. Such receiver may be instructed to seek from the FCC consent to an involuntary assignment or transfer of control of the Broadcast Licenses issued to any Transaction Party by the FCC with respect to any Station [ ] for the purposes of seeking a bona fide purchaser or purchasers or any such Transaction Party's right, title and interest in and to such Station ... The receiver shall have the power subject to Section 9.02, to dispose of any or all of the Transaction Parties' right, title and interest in and to any Station ... including the power to conduct a public or private sale ... *provided, however,* that the successful bidder ... shall not acquire the FCC License with respect to such Station unless and until the FCC shall first have granted its consent to such acquisition.[19]

## C. Procedural History

D.B. Zwirn originally brought suit against Tama in New York Supreme Court for breach of contract pursuant to a "consent to jurisdiction" provision in the Amended Financing Agreement.[20] Plaintiff claims that, as of February 29, 2008, Tama owes approximately $40.1 million dollars plus interest that continues to accrue at an increased post-default rate, as set by the agreement.[21] Plaintiff seeks judgment in the approximate amount $40.1 million plus interest, as well as judicial foreclosure on all of defendants' assets that were pledged as collateral to the loans under the Security Agreement. According

---

16. *See* Pl. Mem. at 6–7.

17. *See id.* at 7.

18. *See id.*

19. Amended Financing Agreement § 9.01(x)(iv). Section 9.02 governs "FCC matters" and states, inter alia, that "The Agent's rights hereunder (and the rights of any receiver appointed by reason of the exercise of remedies hereunder) with respect to the Stations and the FCC Licenses are expressly subject to the Communications Laws." *Id.* § 9.02.

20. *Id.* § 12.10.

21. *See* Compl. ¶ 22.

to plaintiff, this requested foreclosure includes, "subject to any FCC appropriate approval, foreclosure and transfer of the collateral that constitutes stock of Tama [ ] or its subsidiaries that represents control of licenses issued by the FCC ...."[22]

Simultaneous to the filing of the suit, plaintiff filed an Order to Show Cause as to why a temporary receiver should not be appointed. Tama removed the action to federal court on March 27, 2008, prior to the scheduled hearing in state court on the Order to Show Cause, on the grounds that the suit seeks relief under the Communications Act of 1934, a federal statute, and there may be diversity jurisdiction. By letter dated April 3, 2008, plaintiff's counsel requested that this Court conduct an expedited hearing on the Order to Show Cause and the underlying motion to appoint a temporary receiver. The Court held conferences on April 9 and 14, 2008, at which time the parties argued the instant motion. On April 23, 2008, plaintiff amended its complaint to add the Tama Subsidiaries as defendants on the ground that those subsidiaries actually own the FCC licenses pledged as collateral to the loans.

## III. APPLICABLE LAW

### A. Federal Subject Matter Jurisdiction

■ A federal court may exercise jurisdiction only if Congress has passed a statute granting it such jurisdiction.[23] Under 28 U.S.C. § 1331, district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"[24] so that plaintiffs might have a federal forum when they seek to vindicate a federal right.[25] " 'A case arises under federal law within the meaning of [section] 1331 ... if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.' "[26]

### B. Remand

When a plaintiff files a complaint in state court that could have been filed originally in federal court, Congress allows the defendant or defendants to remove the action from state to federal court under 28 U.S.C. § 1441 ("section 1441") and 28 U.S.C. § 1446 ("section 1446"). Section 1441 sets forth the jurisdictional basis for removal, while section 1446 establishes the procedural requirements for removing the action to federal court.

The requirements for considering a motion to remand to state court are set forth in 28 U.S.C. § 1447 ("section 1447"). "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."[27] However, "[i]f at any time before final judgment it appears that the district court lacks subject

---

22. *Id.* ¶ 23.

23. *See* U.S. Const, art. III, § 2. *See also Exxon Mobil Corp. v. Allapattah Servs., Inc.* 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("The district courts of the United States, as we have said many times, are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." (citation and quotation marks omitted)).

24. 28 U.S.C. § 1331.

25. *See Allapattah,* 545 U.S. at 552, 125 S.Ct. 2611.

26. *Bay Shore Union Free School Dist. v. Kain,* 485 F.3d 730, 734 (2d Cir.2007) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 689–90, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006)).

27. 28 U.S.C. § 1447(c).

matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."[28]

The reason for section 1447(c)'s short and strict deadline is obvious: the court and parties have a substantial interest in resolving which court will decide the action before any court or the parties devote resources to the case, or the court resolves particular issues. As Congress explained in passing the statute, " '[s]o long as the defect in removal procedure does not involve a lack of federal subject matter jurisdiction, there is no reason why either State or Federal courts, or the parties, should be subject to the burdens of shuffling a case between two courts that each have subject matter jurisdiction.' "[29]

Because jurisdiction goes to the issue of the court's power, a motion to remand based on lack of subject matter jurisdiction may be made at any time. Either a court has the power to adjudicate a case or it does not. Indeed, a federal court has an independent duty to determine that it has subject matter jurisdiction and may raise the issue *sua sponte*.[30]

## IV. DISCUSSION

### A. Federal Subject Matter Jurisdiction

Prior to the scheduled hearing on plaintiff's motion for appointment of a temporary receiver, Tama removed this action from state court on two grounds: *first*, and primarily, that there is federal subject matter jurisdiction because the "relief [plaintiff] seeks (appointment of a receiver and, ultimately, the sale of Tama's licenses) will result in the transfer, disposition, or transfer of control of the corporation[s] holding Tama's broadcast licenses;"[31] and *second*, that there may be diversity of citizenship among the parties and the amount in controversy exceeds $75,000.[32]

■ Tama now concedes that the Court has no diversity jurisdiction over this action, and that concession is supported by the Court's own review of the facts.[33] Therefore, as Tama implicitly recognized when removing the action from state court, the only possibly valid ground for removal is federal question jurisdiction.

■ While not one of first impression, the jurisdictional issue presented by this case presents a close call.[34] The parties

28. *Id.*

29. *In re Allstate Ins. Co.*, 8 F.3d 219, 223 (5th Cir.1993) (quoting H.R.Rep. No. 889, 100th Cong., 2d Sess. 72 (1988), U.S.Code Cong. & Admin.News. 5982, 6032–33).

30. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). *Accord Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004).

31. Defendant Tama's Notice of Removal ¶ 9.

32. *See id.* ¶¶ 12 21.

33. Plaintiff is a Delaware limited partnership comprised of at least one general partner that is a Delaware corporation. Tama is also a

Delaware corporation. *See id.* ¶¶ 12–14. *See also* Compl. ¶¶ 2–3. In the absence of complete diversity among the parties, diversity jurisdiction cannot be the ground upon which the Court exercises jurisdiction over this action. *See St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80–81 (2d Cir.2005).

34. *See, e.g., Citicasters Co. v. Stop 26–Riverbend, Inc.*, 107 F.Supp.2d 871, 874–76 (N.D.Ohio 2000) (remanding action brought by provider of radio programming against station operator for breach of agreement governing broadcast programming but noting that the jurisdictional issue "troubled" the court since removal and presented a close call).

agree that federal question jurisdiction exists here. Indeed, Tama removed the action from state court on that ground and plaintiff states in its amended complaint that "jurisdiction [ ] is proper because [it] seeks relief pursuant to a federal statute, *i.e.,* the Communications Act of 1934." [35] Notwithstanding the parties' agreement, I hold that there is no federal question jurisdiction over this action because plaintiff's well-pleaded complaint does not assert a federal claim.[36] The parties are correct that plaintiff seeks relief in the form of temporary receivership over and judicial foreclosure of defendants' assets that were pledged as collateral pursuant to the Security Agreement, including the FCC licenses held by the Tama Subsidiaries.[37] The Supreme Court has made clear, however, that the mere invocation of a "federal issue" cannot serve as a "password opening federal courts to any state action embracing a point of federal law." [38] Rather, the "question is, does a state law claim necessarily raise a federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." [39]

At its core, this is a state law breach of contract action. Plaintiff has brought suit for the breach of the financing agreements under which it loaned Tama a large amount of money. Plaintiff now seeks to recover as much of that money as it can by filing a breach of contract action, and by moving for the appointment of a temporary receiver to preserve the value of its collateral. Among its requested relief, plaintiff seeks "foreclosure and transfer of the collateral that constitutes stock of Tama or its subsidiaries that represents control of licenses issued by the FCC ... [and] a receiver to hold (subject to FCC approval) such licenses pending their sale ...." [40] Federal law—the Communications Act—is implicitly invoked because the collateral at issue includes FCC licenses, and the Communications Act governs the transfer of those licenses.

Resolving plaintiff's claim and determining the relief to which it is entitled will likely require some interpretation and application of the Communications Act. However, these issues are ancillary to the core of plaintiff's cause of action. Indeed, plaintiff's request for the appointment of a temporary receiver implicitly invokes the Communications Act only to the extent that plaintiff notes that the receiver's ability to hold the FCC licenses pending their sale is "subject to FCC approval." [41]

The fact that the FCC would have to approve the transfer of licenses from the licensees to a receiver, should one be ap-

---

35. *See* Compl. ¶ 7.

36. *See, e.g., Verizon New York Inc. v. Choice One Commc'ns of New York, Inc.,* 499 F.Supp.2d 326, 336 (S.D.N.Y.2007) (remanding action to state court notwithstanding the parties' agreement that plaintiff's claim arose under the Telecommunications Act where the contractual provision at issue was privately negotiated and was not derived from federal law).

37. *See* Compl. ¶ 23.

38. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 314, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005).

39. *Id.*

40. Compl. ¶ 23.

41. *Id. See McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424, 427 (2d Cir.1965) ("That the contracts [at issue] could not be lawfully carried out save with [Interstate Commerce Commission] approval does not, without more, demonstrate that Congress meant all aspects of their performance or non-performance to be governed by [federal] law [ ] rather than by state law applicable to similar contracts relating to business not under federal regulation.").

pointed, is not really disputed by the parties. Based on the conferences held before the Court, the parties do not and cannot dispute that the mere appointment of a temporary receiver would not per se violate the Communications Act if, as an initial matter, the receiver seeks FCC approval of the transfer of the licenses from the licensees to itself. Moreover, the issue does not—or at least, no longer—presents "a substantial question of federal law."[42] A number of courts have appointed receivers over assets that include FCC licenses where radio station owners have defaulted on loan obligations, without running afoul of the Communications Act.[43] In fact, plaintiff itself notes that the New York State Supreme Court appointed a receiver in a similar case it brought against a different defendant-owner of radio stations, and based on a substantively identical contractual provision to the one found in the financing agreements at issue here.[44]

Plaintiff's invocation of the requirement of FCC approval does not, standing alone, convert its breach of contract claim into one that "arises under" the Communications Act.[45] Although determining the appropriate relief to which plaintiff is entitled—should plaintiff succeed in its action—may require some interpretation of the Communications Act and will involve seeking the approval of the FCC, "it is still the contracts, and not federal law, that the plaintiff[ ] seeks to have enforced."[46]

I remand this action back to state court, but note that Tama's conduct has been deeply troubling. For the brief period during which I have presided over this case, Tama has engaged in numerous tactics that appear motivated by a desire to delay the resolution of plaintiff's breach of contract claim for as long as possible. Plaintiff brought suit in state court and the parties fully briefed plaintiff's motion for

---

**42.** *Bay Shore Union Free School Dist.*, 485 F.3d at 734.

**43.** *See, e.g., MLQ Investors, L.P. v. Pacific Quadracasting, Inc.*, 146 F.3d 746 (9th Cir. 1998) (district court appointed receiver shortly after plaintiff filed suit, authorized receiver to perform his duties, and subsequently entered orders authorizing receiver to sell defendant's assets at private sale, "after securing FCC approval for transfer of the broadcast licenses"); *State Street Bank v. Arrow Commc'ns, Inc.*, 833 F.Supp. 41 (D.Mass.1993) (district court appointed receiver and authorized her to sell defendant's radio station, and the FCC approved each change in broadcast licensee for the station, including the temporary acquisition of the broadcast license by the receiver).

**44.** *See* Pl. Mem. at 10–11 (citing *D.B. Zwirn Special Opportunities Fund, L.P. v. Associated Radio*, No. 603275 (N.Y.Sup.Ct. Jan. 9, 2006)).

**45.** 28 U.S.C. § 1331. *See MFS Telecom, Inc. v. Intrepid Commc'ns Solutions, Inc.*, 39

F.Supp.2d 478, 479 (D.N.J.1999) (dismissing action brought by telecommunications service provider against customer for lack of subject matter jurisdiction, where, "although the rates in the contract [at issue] may have been controlled by tariffs filed with the FCC, "the crux of the [ ] disagreement—the obligation of the defendant to pay—arises out of the agreement itself ... and is not created by the Communications Act" ").

**46.** *Dickinson v. Cosmos Broad. Co., Inc.*, No. 91–T–071–N, 1991 WL 715723, at *6 (M.D.Ala. Apr.1, 1991) (remanding class-action suit for breach of contract and breach of legal duty against broadcasting stations for alleged overcharging for the broadcast of political advertisements on the ground that no federal question jurisdiction exists where the Communications Act provides no federal private action, no serious challenge to federal law was presented, and plaintiffs essentially sought enforcement of certain contracts). *See id.* ("[A]lthough the source of, and force behind the contracts between the plaintiffs and the broadcasters may be federal, it is still the contracts, and not federal law, that the plaintiffs seek to have enforced.").

appointment of a temporary receiver. Just prior to the state court's scheduled hearing on that motion, Tama removed the case to federal court, prompting plaintiff to request that the Court conduct an expedited hearing on its pending motion.[47] Rather than joining in that request, Tama asked that, instead, the Court stay any decision on the motion for appointment pending a decision on its anticipated motion to transfer the action to be consolidated with an action in the Middle District of Florida.[48]

In an effort to become familiar with the issues raised in this action, I convened two expedited conferences with the parties. Once it became clear that the jurisdictional grounds for removal, particularly diversity jurisdiction, were weak, Tama then conceded that removal may have been improv-

ident and requested that the case be remanded back to state court. At each stage, the Court has been struck by Tama's attempts to delay the efforts made first by the state court and now by this Court to reach the merits of this case.[49] I remand this case *sua sponte* because it was improvidently removed to federal court, but I sympathize with plaintiff's frustrated desire to have this case promptly proceed to the merits. For that reason, I include below this Court's anticipated decision on plaintiff's motion for appointment of a temporary receiver should the state court choose to regard it as guidance, however limited, on that still-pending motion.

### B. Motion to Appoint Temporary Receiver[50]

**47.** *See* 4/3/08 Letter from Steven Paradise to the Court ("Paradise Letter") at 1–3.

**48.** *See* 4/4/08 Letter from David Wawro, defendants' counsel, to the Court at 1–2.

**49.** Additionally, at a conference held on April 14, 2008, Tama made yet another attempt to delay by insisting that the motion for appointment of a temporary receiver could not be decided without an evidentiary hearing. *See, e.g.*, Transcript of Court Conference ("4/14/08 Tr.") at 23:7–7–8 (Defendants' counsel: "We strongly believe that before a decision like this is made, an evidentiary hearing is appropriate ...."). This assertion was made despite both parties' repeated representations to the Court only days before that no evidentiary hearing was desired or needed. Indeed, I noted on the record that the parties could have conducted an evidentiary hearing rather than oral argument at that same conference, but had declined to do so. *See id.* at 40:25–41:2 (The Court: "I asked the parties [if an evidentiary hearing was needed]. No, and Mr. Wawro said no too." Plaintiff's counsel: "We both said no, that's correct."). Tama's belated insistence that the motion could not be resolved without an evidentiary hearing was therefore contrary to its own previous assertions.

**50.** This section applies federal common law to the question of whether to appoint a temporary receiver. The vast majority of relevant cases are those that have been properly removed to or filed in federal court based on diversity jurisdiction, and the decision to appoint a receiver in a diversity action is governed by federal common law. *See Varsames v. Palazzolo*, 96 F.Supp.2d 361, 365 (S.D.N.Y. 2000). Because federal common law and New York law have substantively similar standards on whether to grant this motion, as plaintiff concedes, and because I find that the outcome would be the same irrespective of the standard applied, I leave intact the following discussion. *See Ryan Beck & Co., Inc. v. Daly Holdings, Inc.*, No. 06 Civ. 5349, 2006 WL 3775964, at *2 (S.D.N.Y. Dec. 19, 2006) ("The Court need not determine whether state or federal law applies because in practice the [federal and state] standards for appointment are likely to be essentially the same.") (alteration in original) (citation omitted). *Accord* 4/9/08 Transcript of Court Conference ("4/9/08 Tr.") at 19:10–12 (Plaintiff's counsel: "New York law and federal law on this [motion to appoint a temporary receiver] are quite similar. If anything, federal law may be a bit more expansive."). *See also* N.Y. C.P.L.R. 6401 (2007) ("[A] temporary receiver may be appointed ... where there is danger that the property will be removed from the

Plaintiff sets forth two grounds in support of its motion for appointment of a temporary receiver: *first,* that Tama expressly agreed to the appointment pursuant to the terms of the Financing Agreement and the Amended Financing Agreement, which govern the loans at issue; and *second,* apart from the contractual provision, plaintiff's collateral for the loans is in "imminent danger of being lost, materially injured or diminished in value because of [Tama's] insolvency and gross mismanagement."[51]

Plaintiff notes that both the Financing Agreement and the Amended Financing Agreement contain language making clear that Tama "agrees to consent to the appointment of a receiver ... by any court of competent jurisdiction" upon the occurrence of any event of default.[52] Because Tama previously admitted in the Forbearance Agreement that several events of default have already occurred, plaintiff asks that the Court appoint a temporary receiver pursuant to the agreed-upon contractual provision. In support of its motion, plaintiff notes that in previous litigation, the New York State Supreme Court relied on a substantively identical provision in a similar financing agreement between plaintiff and another borrower to appoint a receiver.[53]

Alternatively, even if the Court does not enforce the contractual provision, plaintiff argues for the appointment on the ground that Tama is insolvent and in imminent danger of being forced to shut down its radio stations.[54] As a result, "all of [defendants'] radio equipment, accounts receivable, revenues and value of the broadcasting licenses" granted by the FCC, which plaintiff secured as collateral pursuant to the Security Agreement, are in danger of being lost or devalued. Because the value of plaintiff's collateral depends on Tama's ability to broadcast, and because Tama has conceded that its ability to do so is in jeopardy, plaintiff contends that a receiver must be appointed.[55]

Tama does not dispute that the financing agreements allow for the appointment of a receiver. Rather, Tama premises its opposition primarily on the ground that equitable rather than contractual principles should govern, and plaintiff's own unclean hands should equitably estop it from seeking appointment of a receiver.[56] Specifically, Tama contends that plaintiff grossly mismanaged its operations following plaintiff's take-over of "complete control" of Tama's radio stations pursuant to the LMA. Chris McMurray, Straight Way's consultant, allegedly mismanaged Tama's properties by, inter alia, unilaterally cancelling programming at its radio stations in violation of certain agreements, diverting payments from Tama's customers to plaintiff's accounts, and refusing to reimburse Tama for operating expenses in violation of the LMA.[57]

As an initial matter, the contractual provision in the financing agreements is a factor that the Court considers in deciding whether appointment is warranted. In the context of mortgage agreements, the Second Circuit Court of Appeals has affirmed

---

state, or lost, materially injured or destroyed.").

**51.** Paradise Letter at 1–2.

**52.** Amended Financing Agreement § 9.01(x)(iv).

**53.** *See* Pl. Mem. at 10–11.

**54.** *See id.* at 12–16.

**55.** *See id.*

**56.** *See* Defendant Tama's Memorandum of Law in Opposition to Plaintiff's Motion, by Order to Show Cause, for Appointment of a Temporary Receiver ("Def.Opp.") at 2–5.

**57.** *Id.*

the appointment of a receiver where the agreement provided that plaintiff may apply for such appointment upon the occurrence of any event of default, as defined therein.[58] Where it was undisputed that several events of default had occurred, the court found the provision "strongly support[ed] the appointment of a receiver." [59]

■ The mere existence of such contractual provision does not, however, dispose of the Court's inquiry in plaintiff's favor. Indeed, courts retain the "discretion to deny appointment of a receiver under appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment." [60] However, the existence of such language, presumably negotiated between the parties, is a factor militating in plaintiff's favor [61] and the party opposing the appointment bears the burden of demonstrating why a receiver should not be appointed.[62]

Considering all of the factors relevant to the inquiry, including the existence of the contractual provision, I grant plaintiff's motion to appoint a temporary receiver.

Although plaintiff does not allege that Tama has engaged in any fraudulent conduct,[63] this Court has appointed receivers even where there was no evidence of fraud.[64]

It is undisputed that Tama has defaulted on its loan obligations under the financing agreements, although the exact amount that remains outstanding may be in dispute.[65] Tama contends that plaintiff, specifically, Straight Way, is responsible for gross management following the execution of the LMA, thereby jeopardizing its operations. Tama, however, cannot contest that its payment obligations under the financing agreements were due and unmet prior to the LMA, and its failure to make those payments cannot be attributed to the actions of plaintiff or Straight Way.

According to plaintiff, Tama's current outstanding debt includes rent for several of its radio stations, property taxes, six thousand dollars per month pursuant to a settlement agreement in a different case, and payments to an industry research company.[66] As a result of these debts, as well as the amount due to plaintiff, Tama

---

**58.** *See, e.g., Citibank v. Nyland (CF8) Ltd.,* 839 F.2d 93, 97 (2d Cir.1988) ("It is entirely appropriate for a mortgage holder to seek the appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default.").

**59.** *Id.*

**60.** *Ariani v. 1075 Concourse Tenants Corp.,* No. 93 Civ. 0377, 1999 WL 637238, at *2 (S.D.N.Y. Aug. 20, 1999) (citations omitted).

**61.** *Cf. Melnick v. Press,* 2007 WL 2769490, at *2 (E.D.N.Y. Sept. 21, 2007) (denying plaintiff's motion to appoint a temporary receiver where, inter alia, "[p]laintiffs have failed to point to any contractual provision that contemplates the appointment of a receiver with regard to these [ ] properties ...."

**62.** *See id.* at *2–3.

**63.** *See* Def. Opp. at 6.

**64.** *See, e.g., United States v. Trusty Capital, Inc.,* No. 06 Civ. 8170, 2007 WL 44015, at *8 (S.D.N.Y. Jan. 5, 2007) (granting plaintiff's motion for appointment of receiver even in the absence of evidence of fraud where defendant defaulted on its payments to plaintiff).

**65.** *See* Affidavit of Dr. Glenn W. Cherry, president and chief executive officers of Tama, in Opposition to Plaintiff's Motion for Appointment of a Temporary Receiver ("Cherry Aff."), attached to Def. Opp., ¶ 3. *Accord* 4/9/08 Tr. at 14:13–25 (Defendants' counsel: "There is a payment default, yes.").

**66.** *See* Affidavit of Chris McMurray ("McMurray Aff."), consultant to Straight Way, attached to Plaintiff's Order to Show Cause for an Appointment of Temporary Receiver, ¶ 7.

is insolvent and "will soon lose all of its assets and [plaintiff] in turn, will lose all of its security, and any chance to recover on its loans." [67] Additionally, plaintiff's collateral is in further danger due to Tama's alleged failure, inter alia, to maintain the lighting for certain of its broadcast towers in violation of the FCC and the Federal Aviation Administration's regulations, to employ at least two employees at each of its five main stations in violation of FCC regulations, and to properly maintain its radio equipment.[68]

 While Tama contests some of these points and asserts that it has actually improved many aspects of its operations,[69] regardless of who is at fault, Tama concedes that "its ability to continue to broadcast [is] at risk." [70] Irrespective of which party bears the bulk of the blame for placing the operations at risk, the fact remains that there is an imminent danger of the property being diminished in value and possibly lost. Tama's claim that a temporary receiver should not be appointed because of plaintiff s alleged "unclean hands" is not convincing. The temporary receiver—an officer of the court tasked with the "duty to preserve and protect the property pending the outcome of the litigation" [71]—will work to discharge that duty without deference to either party and with preservation of the property as its sole objective. Should plaintiff indeed be the party responsible for mismanagement, then the temporary receiver would equally protect the assets against plaintiff as it would against defendants. The temporary receiver's sole loyalty and responsibility lies with the Court and the assets, rather than with any of the parties.

Tama's mounting obligations, in addition to the money owed to plaintiff, and its failure to "demonstrate any concrete plan for recovering its debts" [72] strongly militates in favor of appointment. Notwithstanding the assertion made by Tama's affiant that the Court should require the parties "to develop a plan to market the properties for a deliberate arms-length sale" rather than appoint a receiver, that level of cooperation and communication between the parties appears highly unlikely at this time.[73]

I briefly turn to the remaining factors relevant to the appointment inquiry. In light of the amount of plaintiff's loans, Tama's concession that numerous events of

---

67. Pl. Mem. at 14.

68. *See id.* at 14–16. *Accord* McMurray Aff. ¶ 9.

69. *See, e.g.,* Cherry Aff. ¶¶ 20–21. For example, defendant asserts that it has maintained the operations for all of its transmitting facilities, purchased new transmitters, scheduled the painting of certain towers, and is in the process of assessing whether to use the FCC construction permits it contends have not expired. *See id.*

70. *Id.* ¶ 10.

71. *Citibank, N.A.,* 839 F.2d at 98.

72. *Trusty Capital,* 2007 WL 44015, at *8 (stating that defendant's failure to demonstrate a concrete recovery plan other than borrowing additional funds is an "insufficient guarantee, and would leave [plaintiff] with insufficient means to recover what it is owed").

73. Indeed, the only purported proposal for the purchase of defendants' assets was preliminarily rejected by plaintiff's counsel as undervalued and generally unacceptable. *See* 4/4/08 Letter from Dario Echeverry Campos, Chairman of HLE Consulting, Inc., to Glenn W. Cherry, president of Tama, Ex. 3 to Defendant Tama Broadcasting's Supplemental Memorandum in Opposition to Appointment of a Temporary Receiver. *See also* 4/14/08 Tr. at 20:19–23 (Plaintiff's counsel: "[The offer is] for $11 million. Number three, it's free and clear of all liens. So I think there are several problems just off the surface. Our appraisers had indicated, as I mentioned in court last week, that the value's closer to $20, 25 million.").

default under the financing agreements have occurred, and the current state of Tama's operations, I find that denying plaintiff's motion would harm plaintiff more than the appointment would injure defendants. In fact, Tama has failed to demonstrate how such appointment would injure it, other than displacing some of its own authority. Additionally, there is a strong probability that plaintiff will succeed in its underlying action, which is premised on Tama's admitted breach of the financing agreements by failing to fulfill its payment obligations.

There may be alternative legal remedies that would protect the property at issue here. Tama concedes that while plaintiff "may be entitled to recover on its rightful investment," [74] it should "exercise it[s] rights as a secured party with respect to the [c]ollateral by seeking damages and judgment at trial." [75] However, considering all of the relevant factors including the contractual language agreed to between the parties regarding receivership and the imminent danger of Tama's property continuing to diminish in value, this factor is not dispositive.

Finally, I briefly turn to Tama's argument that the appointment of a temporary receiver would violate the Communications Act. Section 310(d) of the Communications Act prohibits the transfer of a FCC license without the application to and approval of the transfer by the FCC. [76] Tama contends that because plaintiff "does not even allege that it has made such an application to the FCC—much less obtained the required approvals ... Tama is required by law to maintain control of its licenses." [77]

Though not binding, the authority on this issue weighs in favor of finding that appointment of a temporary receiver would not run afoul of the Communications Act. Plaintiff primarily relies upon the Ninth Circuit's decision in *Phoenix Leasing Inc. v. Sure Broadcasting, Inc. ("Phoenix Leasing")* to dispute Tama's argument. [78] At the outset, I note that *Phoenix Leasing* was not published as an opinion by the Ninth Circuit. However, on at least one occasion, this Court has relied on an unreported Ninth Circuit case "involving strikingly similar facts" that was "directly on point." [79] The facts of *Phoenix Leasing* are strikingly similar to the ones at issue here, and I find the opinion persuasive notwithstanding the Ninth Circuit's decision not to publish it.

In *Phoenix Leasing*, the Ninth Circuit affirmed the district court's appointment of a receiver where the parties had entered

---

**74.** Def. Opp. at 8.

**75.** *Id.* at 7.

**76.** *See* 47 U.S.C. § 310(d) ("No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.").

**77.** Def. Opp. at 9.

**78.** Nos. 94–15594, 95–16204, 1996 WL 219608 (9th Cir. May 1, 1996).

**79.** *Conopco, Inc. v. Roll Int'l Corp.*, 75 F.Supp.2d 196, 200–01 (S.D.N.Y.1999), *aff'd*, 231 F.3d 82 (2d Cir.2000) ("The fact that the Ninth Circuit chose not to publish [its opinion] leaves this Court in a quandary. The Ninth Circuit rule governing citation of unpublished opinion states that an unpublished case 'may not be cited to or by' the courts of the Ninth Circuit. The rule is silent as to citation by courts outside the circuit. In these circumstances, I assume [the Ninth Circuit opinion] is not binding precedent. It is, however, directly on point and persuasive; accordingly, I adopt the reasoning set forth therein.").

into a loan agreement providing for the plaintiff to petition for a court-appointed receiver should any event of default occur, defendant defaulted, and plaintiff brought suit. "The [district] court appointed a receiver over all of [defendant's] assets and directed the receiver to apply to the FCC for assignment of the licenses." [80] Thereafter, the "FCC approved the transfer of the licenses *to the receiver*."[81]

The Ninth Circuit rejected the defendant's argument that the district court's appointment of a receiver violated FCC policy, and in doing so, made several observations. *First*, although it is clear that "creditors cannot foreclose on an FCC license," "they may have an interest in the proceeds from the sale of the license." [82] Therefore, plaintiff, as Tama's creditor, has a legitimate interest in the value of the FCC licenses held by Tama's subsidiaries.

*Second*, "the FCC has routinely approved involuntary assignments of licenses in cases where licensees have filed for bankruptcy or where courts have appointed receivers." [83] Under *Phoenix Leasing*, it is the responsibility of the receiver to comply with section 310(d) of the Communications Act and to seek the FCC's approval of the involuntary transfer of the licenses from the licensees to itself. The FCC may exercise its discretion to deny approval at that time. Based on the persuasive authority of other courts that have addressed this precise issue, the fact that

receivers have been appointed over assets including FCC licenses on numerous occasions, and Tama's failure to cite to any case holding otherwise, the mere appointment of a receiver does not per se violate the Communications Act.[84]

## V. CONCLUSION

For the reasons set forth above, this action is remanded to state court for lack of subject matter jurisdiction. The Clerk of the Court is directed to close all pending motions and this case.

SO ORDERED.

---

80. *Phoenix Leasing*, 1996 WL 219608, at *1.

81. *Id.* (emphasis added).

82. *Id.* (citation omitted).

83. *Id.* (quotation marks omitted).

84. Defendants' reliance on *Kidd Commc'ns v. Federal Commc'n Comm'n* is misplaced. There, the D.C. Circuit held that the FCC had provided inadequate explanation for its decision to approve the application to transfer defendant's radio station license back to the

original seller. *See* 427 F.3d 1 (D.C.Cir. 2005). The court held that the FCC's decision was in conflict with its own regulation prohibiting a seller from retaining a reversionary interest in a station license, as well as the policy prohibiting a license holder from granting a security interest in a broadcast license. This case is distinguishable as there is no dispute regarding the appointment of a receiver. Furthermore, here, plaintiff seeks only to preserve the value of the broadcast licenses through the appointment of a receiver rather than take any direct action with respect to those licenses.