STRAUB, Circuit Judge,
dissenting:
Sixteen billion dollars. Over four hundred million shares. Facebook. The high-profile” nature of this case sways the majority’s analysis. It is true that the Face-book IPO was front-page news. But it simply cannot be true that every time a case involves a famous company or a multibillion dollar IPO, federal courts have jurisdiction.
By exercising federal question jurisdiction over state law claims that are premised on the internal rules of a private corporation, the Court extends federal court jurisdiction far beyond its permissible bounds. The majority’s expansion of our jurisdiction flies in the face of the dictates of this Circuit and the Supreme Court urging restraint. I therefore respectfully dissent.
DISCUSSION
This case is about UBS’s state law claims against NASDAQ stemming from Facebook’s IPO. The majority contends that we have jurisdiction because the state law claims are premised on the contention that NASDAQ breached its Exchange Act duty to maintain a fair and orderly market by violating its own internal rules. This conclusion runs afoul of nearly every Grable-Gunn requirement. There is no actually disputed federal issue, to the extent one exists, it is not “substantial,” and exercising jurisdiction disrupts the federal-state balance approved by Congress.
First, NASDAQ is a shareholder-owned, publicly-traded, for-profit company. It is not the SEC and its rules are not federal regulations or federal law. In fact, we have explicitly held that the rules of a stock exchange are contractual in nature and within the province of state law. The only arguably federal issue present is a broad duty found in the Exchange Act and that duty is not actually disputed.
Second, UBS’s state law claims do not present a “substantial” federal question. In drawing the contrary conclusion, the majority ignores or misapplies controlling case law from the Supreme Court and this Circuit. We have held that state law claims premised on violations of the rules of a stock exchange do not give rise to a “substantial” federal issue. The majority holding renders our case law incoherent.
Moreover, Supreme Court precedent independently forecloses the exercise of federal jurisdiction. Substantial does not mean “large” or “significant” as the majority suggests. Rather, it means that the issue is important to federal jurisprudence. The Court has repeatedly admonished that federal courts may entertain this “extremely rare exception!]” only in cases that pose a discrete question of law as to the construction or validity of a federal statute or the U.S. Constitution. See Gunn v. Minton, — U.S.-, 133 S.Ct. *1037 1059, 1064, 185 L.Ed.2d 72 (2013). That kind of issue is not present here.
Finally, exercising jurisdiction here would upset Congressional intent as to the balance of federal-state responsibility. I disagree with the majority that Congress’s decision to grant federal courts exclusive jurisdiction over Exchange Act violations suggests a similar intent to grant jurisdiction over stock exchange rule violations. In fact, I believe it suggests the opposite.
The majority’s uncabined holding could lead to a “tremendous number of cases” being pulled into federal court — a possibility that should give us pause. See Grable & Sons Metal Prods., Inc. v. Dame Eng’g & Mfg., 545 U.S. 308, 318, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). The majority offers no response to this concern other than a conclusory assertion that this shift to federal court will not occur.
For these reasons, I would reverse the decision of the District Court and dismiss the complaint for lack of jurisdiction.
I. UBS’s state law claims present no actually disputed federal issue.
Grable and Gunn require a federal issue to be “actually disputed.” The majority identifies two different, though related, issues underlying UBS’s claims: whether NASDAQ violated its own rules and whether NASDAQ violated its Exchange Act duty to maintain a fair and orderly market. But NASDAQ’s rules are not federal and the Exchange Act is not actually in dispute.
A. NASDAQ’s rules are not federal.
The rules at issue — the rules of a stock exchange — are matters of state law. We held as much in Barbara v. New York Stock Exchange, Inc., where we stated: “[T]he rules of a securities exchange are contractual in nature, and are thus interpreted pursuant to ordinary principles of contract law, an area in which the federal courts have no special expertise.” 99 F.3d 49, 54-55 (2d Cir.1996) (internal citation omitted). We then reaffirmed our holding that stock exchange rules are contractual in D’Alessio v. New York Stock Exchange, Inc., 258 F.3d 93, 101 (2d Cir.2001). The majority does not challenge or reject our holding that the rules of a stock exchange are creatures of state law.
The majority opinion strongly implies that because NASDAQ is subject to heavy federal regulation, its internal rules are sufficiently federal to sustain federal question jurisdiction. See Opinion (“Op.”) at 1043-45. But NASDAQ is a shareholder-owned, publicly-traded, for-profit company. See What is NASDAQ? available at http:// www.nasdaqomx.com/aboutus/companyinformation/whatisnasdaq. It is not a federal agency, nor are its rules federal law or federal regulations. Indeed, the primary responsibility for promulgating and enforcing the rules of a stock exchange lies with the stock exchange itself. See United States v. Solomon, 509 F.2d 863, 868 (2d Cir.1975) (quoting Silver v. New York Stock Exch., 373 U.S. 341, 352, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)). The federal government acts only as a backstop, bolstering the “exchanges’ traditional process of self-regulation.” Id.; see also United States v. Stein, 440 F.Supp.2d 315, 336 (S.D.N.Y.2006) (“The stock exchanges had rules and disciplinary mechanisms to enforce them even before the Securities Exchange Act of 1934 brought the industry under federal regulation.”).
Moreover, simply because an industry is subject to heavy federal regulation does not elevate it to the status of a government entity, nor are its internal rules elevated to the status of federal law. In Desiderio v. National Association of Securities Deal *1038 ers, Inc., we considered a case involving the National Association of Securities Dealers (NASD) — the precursor to NASDAQ — and concluded that “the fact that a business entity is subject to extensive and detailed state regulation does not convert that organization’s actions into those of the state.” 191 F.3d 198, 206 (2d Cir.1999) (quotation marks omitted). We noted further that a self-regulatory organization, like the NASD, “is a private actor, not a state actor. It is a private corporation that receives no federal or state funding. Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee.” Id. We need not exercise this extraordinary type of federal question jurisdiction over state law claims that implicate only the internal rules of a private corporation in a regulated industry.
B. The Exchange Act is not actually disputed.
The only arguably federal element present in these state law claims — the duty to maintain a fair and orderly market — is not actually in dispute. Unlike in Grable (where the parties argued for competing interpretations of a federal statute) or Gunn (where one party argued that a patent law exception applied to his lease and the other party argued that it did not), no party here disputes the existence, validity, or construction of this Exchange Act duty. See Gunn, 133 S.Ct. at 1065-66 (“The federal issue is also ‘actually disputed’ here— indeed, on the merits, it is the central point of dispute.”); Grable, 545 U.S. at 315, 125 S.Ct. 2363 (“[T]he meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case.”). Nor does any party argue that any NASDAQ rule is inconsistent with the Exchange Act.
The majority opinion does not challenge this point. The only actually disputed issues identified by the majority opinion are issues concerning the application of NASDAQ rules to the circumstances of the Facebook IPO. See Op. at 1043-45. Although the Exchange Act provides the backdrop for applying the NASDAQ rules, the Exchange Act itself is not at issue in this litigation. We are therefore required to decline to exercise federal question jurisdiction over these state law claims.
II. UBS’s state law claims present no “substantial” federal issue.
Grable and Gunn also require the federal issue to be “substantial.” But this is exactly the sort of case that we and the Supreme Court have held does not present a sufficiently “substantial” federal question. Our precedent specifically forecloses the majority holding that violations of the rules of a stock exchange present a substantial federal issue. The majority’s strained attempt to distinguish those cases is unconvincing.
Moreover, the majority misunderstands, and thus misapplies, the controlling cases from the Supreme Court. Supreme Court precedent permits federal courts to exercise federal question jurisdiction absent a federal cause of action only when the embedded federal issue is a pure question of law as to the construction or validity of a federal statute or the U.S. Constitution. This case presents no such issue. To the contrary, the majority’s argument that a “substantial” federal issue exists where a duty from federal law is implicated in a state law claim has been specifically rejected by the Supreme Court.
A. Our precedent forecloses the exercise of federal question jurisdiction here.
Our own precedent proscribes the exercise of federal question jurisdiction over *1039 state law claims arising from alleged violations of the rules of a stock exchange— even in cases where those rules implicate the core duties of a stock exchange.
Barbara v. New York Stock Exchange, Inc. is fatal to the majority’s holding. In Barbara, we declined to exercise federal question jurisdiction over state law claims arising from alleged violations of the rules of a stock exchange. The facts of Barbara are as follows: The SEC initiated an investigation into alleged misconduct by Barbara, a floor clerk at the New York Stock Exchange (N.Y.SE), and his employer, a securities brokerage firm. 99 F.3d at 51. After the SEC filed disciplinary charges against Barbara, the NYSE barred Barbara from working on the floor of the NYSE pending a formal hearing. Id. at 52. Despite the eventual reversal of the charges against him, the NYSE Enforcement Division continued to bar Barbara from working on the NYSE floor, causing him to leave the securities industry. Id.
Barbara brought numerous state law claims against the NYSE. Id. Those claims, we assumed in the opinion, were contingent on proving that the NYSE violated its own rules. Id. at 54. Nevertheless, we held that the federal issue presented was “insufficiently substantial” to generate federal question jurisdiction over Barbara’s state law claims. Id. at 55.
UBS’s state law claims premised on NASDAQ violating its own rules are also insufficiently substantial. The majority attempts to distinguish Barbara by arguing that (1) there is no “separate agreement between the parties ... that might afford UBS rights distinct from those reflected in NASDAQ’s SEC-approved rules”; (2) Barbara had no “occasion to consider or discuss the fact that, unlike most contracts between private parties, exchange rules are subject to SEC approval”; and (3) unlike Barbara’s claims, UBS’s claims “charge NASDAQ with violating the core duty of a federally registered SRO under the Exchange Act.” See Op. at 1047-48.
I am not persuaded.
1. The existence or absence of a separate agreement is irrelevant here.
The majority first argues that Barbara’s observation that stock exchange rules are contractual derives from a case in which “this court had to decide which of two agreements controlled an arbitration dispute: the general arbitration provision in the American Stock Exchange’s SEC-approved constitution or the parties’ more specific customer agreement pertaining to arbitration.” Op. at 1047 (citing Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis, 903 F.2d 109 (2d Cir.1990)). In our case, the majority notes, there is “no comparable separate agreement between the parties.” Op. at 1047.
I do not understand how this is relevant. The salient conclusion in Merrill Lynch is that we “view[ed] both agreements as contractual.” Op. at 1047. The presence of the second agreement is irrelevant to the conclusion that the SEC-approved constitution is contractual in nature. Moreover, in Barbara, there was no “comparable separate agreement” and yet we had no trouble declining to exercise federal jurisdiction. Barbara’s conclusion that stock exchange rules are contractual is not the only significant aspect of the decision. Its holding is also important, and Barbara held that federal jurisdiction does not extend to state law claims premised on the violation of a stock exchange rule. Those are just the kind of claims that are before us today.
2. Barbara explicitly considered the role of the SEC.
Far from having no “occasion to consider or discuss the fact that, unlike most *1040 contracts between private parties, exchange rules are subject to SEC approval,” Op. at 1047, the Barbara court explicitly acknowledged that the rules of a stock exchange “are subject to SEC approval,” and that “the [Exchange] Act requires that these disciplinary proceedings be conducted in compliance both with the Act and with the Exchange’s rules and regulations.” Id. at 1031. We noted further that “[n]otice of any final disciplinary sanction imposed by the Exchange must be provided to the SEC, and the imposition of a sanction is subject to review by the SEC on its own motion or at the instance of an aggrieved party.” Id. (citing 15 U.S.C. §§ 78s(d)(l)-(2)). It is therefore inaccurate to read Barbara as failing to consider the role of the SEC in approving and enforcing stock exchange rules.
3. Both this case and Barbara implicate a core duty of a stock exchange.
Finally, the majority’s primary argument is that “the parties’ dispute in Barbara did not implicate one of the most fundamental functions of a national securities exchange.”[1] Op. at 1048 (quotation marks omitted). Indeed, the majority characterizes the dispute in Barbara as “trifling.” Op. at 1047. This contention is inaccurate. Although the majority attempts to downplay the importance of the circumstances in Barbara, that case involved one of the most fundamental functions of a stock exchange — the duty to discipline stock exchange members and associated persons in order to protect the investing public. Indeed, the allegations of misconduct against Barbara were no mere administrative or technical matter. Rather, Barbara and one of his employers — a securities brokerage firm — were alleged to have improperly executed trades for the clients of a different brokerage firm. See Barbara Proposed Am. Compl. ¶¶ 9-12.
As an employee of a brokerage firm that was a member of the New York Stock Exchange, Barbara was “of the class of persons whose conduct is regulated by the Exchange pursuant to its duties under the Exchange Act.” Barbara, 99 F.3d at 54. He was therefore disciplined — pursuant to 15 U.S.C. § 78f(e) and (d) — as a person associated with a member of the New York Stock Exchange. See Barbara, 99 F.3d at 51; see also Barbara v. New York Stock Exch., Inc., 94-CV-1088 (ARR), 1995 WL 221487, at *5 (E.D.N.Y. Mar. 30,1995) (noting that the disciplinary actions taken against Barbara were “clearly authorized by the Securities Exchange Act and by Exchange Rules 35 and 308”) (citing 15 U.S.C. § 78f(c) and (d)).
The discipline of national securities exchange members and persons associated with members is a core function of an exchange and is specifically provided for in the Exchange Act. See, e.g., 15 U.S.C. § 78f(c) and (d). The purpose of such discipline is to protect investors and maintain an orderly market. For example, the Exchange Act provides that a national securities exchange may bar or condition the association of a natural person with a member if that person has engaged “in *1041 acts or practices inconsistent with just and equitable principles of trade.” 15 U.S.C. § 78f(c)(3)(B)(ii). And an exchange may summarily “limit or prohibit any person with respect to access to services offered by the exchange” if the exchange determines that “such person cannot be permitted to continue to have such access with safety to investors, creditors, members, or the exchange.”[2] 15 U.S.C. § 78f(d)(3).
The discipline of members and associated persons is grounded in the duty of a stock exchange to “prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade ... [and] to protect investors and the public interest.” 15 U.S.C. § 78f(b)(5). Therefore, the provisions governing member discipline are equally grounded in the overarching duty to maintain a “fair and orderly market.” 15 U.S.C. § 78kl(a)(l)(C).
Indeed, under the majority's reasoning, Barbara is a stronger case for exercising federal jurisdiction than the one before us. Whereas 15 U.S.C. § 78f — the Exchange Act provision governing national securities exchanges — is silent on any duty specifically concerning the administration of a public offering, the provision specifically and repeatedly provides for the discipline of exchange members and the barring of broker-dealers from membership. See 15 U.S.C. § 78f(c) and (d).
Of the eight requirements that must be satisfied before a securities exchange can be registered, two concern member discipline. See 15 U.S.C. § 78f(b)(6) and (7). Before the SEC will register a national securities exchange, it must determine that “[t]he rules of the exchange provide that ... members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this chapter, the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.” See 15 U.S.C. § 78f(b)(6); see also 15 U.S.C. § 78f(b)(7) (providing that the SEC will register a national securities exchange only if it first determines that the rules of the exchange provide for a fair procedure for disciplining members).
Thus, while the duty to administrate a fair public offering is certainly important, the Exchange Act does not indicate that such a duty is any more important than the general duty of a securities exchange to administrate day-to-day securities trading. And the Exchange Act itself places far more specific emphasis on the duty of a securities exchange to discipline members for unethical or illegal conduct.
There is therefore no distinction between this case and Barbara. Both involve state law claims premised upon possible violations of stock exchange rules and both involve rules governing a core function of the stock exchange as set forth in the Exchange Act. The duty to properly manage an IPO and the duty to discipline members and associated persons are both “critical, federally mandated” duties. See Op. at 1048.. But we have held that stock exchange rules implicating such duties are insufficient by themselves to generate federal question jurisdiction.
*1042 4. D’Alessio v. New York Stock Exchange does not support the majority’s position.
Nothing in D’Alessio v. New York Stock Exchange, Inc., 258 F.3d 93 (2d Cir.2001) changes our conclusion in Barbara that the rules of a stock exchange alone are insufficient to exercise federal jurisdiction. Indeed, in D’Alessio we reiterated that the internal rules of a stock exchange should be examined “in accordance with well settled principles of contract interpretation— a task uniquely within the province of state law.” 258 F.3d at 101. We did not distinguish Barbara from D’Alessio on the ground that some stock exchange rules give rise to federal question jurisdiction and others do not. We distinguished Barbara on the ground that D’Alessio alleged more than the violation of stock exchange rules. He alleged that the stock exchange violated the federal securities laws themselves. See id. (“In contrast, here, the federal interest is more substantial because D’Alessio’s complaint does not simply challenge the propriety of disciplinary proceedings conducted by the NYSE.... Rather, an examination of the allegations contained in the complaint establishes that D’Alessio’s suit is rooted in violations of federal law....”). No such allegation is made here.
Thus, under Barbara, the federal issue is not substantial.
B. Supreme Court precedent independently forecloses the exercise of federal question jurisdiction over UBS’s state law claims.
Even without considering Barbara, I would reach the same conclusion. The majority opinion misunderstands the meaning of “substantial” in the GrableGunn context. “Substantial” means, not necessarily “large” or “significant,” but important to federal jurisprudence, i.e., the collective body of federal case law. Grable-Gunn jurisdiction must therefore be exercised only over state law claims that implicate a federal issue that is a pure question of law concerning the validity or construction of a federal statute or the U.S. Constitution.
Supreme Court precedent also holds that state law claims incorporating a standard “derive[d] directly from federal law,” see Op. at 1021, as here, are insufficiently substantial to generate federal question jurisdiction. The majority dismisses this contrary precedent.
1. Grable-Gunn jurisdiction can be exercised only over state law claims that turn on the construction of a federal statute or the U.S. Constitution.
As the majority opinion acknowledges, the exercise of federal question jurisdiction in the absence of a federal cause of action is extremely rare. See Op. at 1019. The Supreme Court has approved of the exercise of such jurisdiction in only four cases. Those cases, and others where jurisdiction has been declined, demonstrate that “substantial” in the Gunn-Grable context is a term of art. The majority opinion misinterprets “substantial” to mean “large” or “significant.” See, e.g., Op. at 1027 (arguing that this case presents a “substantial” issue because it was “in the context of one of the largest public stock offerings in history — involving 421 million shares valued at $16 billion”). In this context, “substantial” means “important to federal jurisprudence.”
Supreme Court precedent generally divides issues into two categories. Pure questions of law that involve the construction or validity of a federal statute or the U.S. Constitution may be substantial enough to warrant federal jurisdiction. Each of the four cases where the Supreme *1043 Court approved this kind of jurisdiction shared that key and necessary hallmark:
• Grable & Sons Metal, Prods., Inc. v. Darue Eng’g & Mfg., 545 U.S. 308, 310, 315 [125 S.Ct. 2363, 162 L.Ed.2d 257] (2005): Federal question jurisdiction existed where the meaning of a federal tax provision — specifically, what constituted adequate notice pursuant to 26 U.S.C. § 6337(b)(1) — was in dispute. The Court noted that “[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court” and that this issue of federal law “appears to be the only legal or factual issue contested in the case.”
• City of Chicago v. Int'l Coll, of Surgeons, 522 U.S. 156, 160, 164 [118 S.Ct. 523, 139 L.Ed.2d 525] (1997): Federal question jurisdiction existed where plaintiffs claimed that a city ordinance was facially unconstitutional in violation of the Fifth and Fourteenth Amendments.
• Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 201 [41 S.Ct. 243, 65 L.Ed. 577] (1921): Federal question jurisdiction existed because the “decision depends upon the determination” of “the constitutional validity of an act of Congress which is directly drawn in question” — specifically, whether Congress had acted unconstitutionally in issuing certain bonds.
• Hopkins v. Walker, 244 U.S. 486, 488-89 [37 S.Ct. 711, 61 L.Ed. 1270] (1917): Federal question jurisdiction existed where “the determination of the plaintiffs’ rights requires a construction of the [federal] mining laws under which the proceedings resulting in the patent were had, and a decision of what, according to those laws, passed by the patent, and what, if anything, was excepted and remained open to location.”
In contrast, the Court has explicitly and repeatedly admonished that federal courts should not exercise federal question jurisdiction over state law claims if the federal issue is not a pure question of law, but is “fact-bound and situation-specific.” Gunn, 133 S.Ct. at 1068 (“Such fact-bound and situation-specific effects are not sufficient to establish federal arising under jurisdiction.”) (quotation marks omitted).
For example, in Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006), the Court reviewed a reimbursement claim brought by an insurance carrier pursuant to a health care contract authorized by the Federal Employees Health Benefits Act. The Supreme Court affirmed our holding that the federal court did not have federal subject matter jurisdiction. Id. at 701, 126 S.Ct. 2121. In doing so, the Court distinguished Grable, noting that the federal issue embedded in the reimbursement claim was “fact-bound and situation-specific,” rather than the “nearly pure issue of law” presented in Grable. Id. at 700-01, 126 S.Ct. 2121. The Court also relied on the fact that the federal issue in Grable was “one that could be settled once and for all and thereafter would govern numerous tax sale cases.” Id. at 700, 126 S.Ct. 2121.
We have echoed this limitation on the exercise of Grable-Gunn jurisdiction. See Fracasse v. People’s United Bank, 747 F.3d 141, 145 (2d Cir.2014) (declining to exercise federal question jurisdiction over state law claims based on public policy articulated in the FLSA because “[t]he FLSA needs no interpretation in connection with the state tort claims that have been pled”); Congregation Machna Shalva Zichron Zvi Dovid v. U.S. Dep’t of Agrie., 557 FedAppx. 87, 90 (2d Cir.2014) (declining to exercise federal question jurisdiction over a state law claim because “the determination at issue here is a fact- *1044 specific application of the regulations to [the plaintiff] that does not implicate the validity of the regulations themselves”).
There is no dispute that the arguably federal issue in this case is not a pure question of law, but rather a question of how stock exchange rules should be applied to the unique facts of the Facebook IPO. The majority opinion acknowledges as much. See Op. at 1021 (noting that the key question here is “how NASDAQ’s duty to operate a fair and orderly market ... applies in the context of an IPO generally, and particularly with respect to the Face-book IPO”). All of the potentially disputed issues identified by the majority involve the application of this duty to the specific context of the Facebook IPO. For example, the majority argues that this litigation may require a court to determine whether NASDAQ should have cancelled certain UBS trades placed during the Facebook IPO pursuant to NASDAQ Rule 11890. See Op. at 1022-23. The majority also contends that a court may have to determine whether NASDAQ properly adhered to Rules 4120 and 4753 — governing how NASDAQ is required to fill orders, provide disclosures, and make decisions regarding initiating, halting, and resuming trading— during the Facebook IPO. See Op. at 1022.
The question of how NASDAQ rules should have been applied to a specific IPO is exactly the sort of “fact-bound and situation-specific” question that the Supreme Court has repeatedly held does not give rise to this rare type of federal question jurisdiction. Not only does this case present only fact-specific legal issues, the legal issues at stake do not involve the construction or validity of a federal statute or the U.S. Constitution. This litigation requires only the application of the rules of a stock exchange, which — notwithstanding the majority’s attempt to elevate such rules to federal status — we have repeatedly held are non-federal in nature.
2. The incorporation of a federal statutory standard into a state law claim is insufficiently substantial to generate federal question jurisdiction.
The incorporation into a state law claim of the Exchange Act’s general duty to provide a fair and orderly market is insufficiently substantial to trigger federal question jurisdiction.
In Merrell Dow Pharmaceuticals, Inc. v. Thompson, the Supreme Court rejected an analogous attempt to generate federal question jurisdiction by incorporating a federal statutory standard into a state law claim. 478 U.S. 804, 814, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). There, the Supreme Court examined a product liability claim against a drug manufacturer. As an element of one of their state law claims, plaintiffs alleged that the drug was misbranded in violation of the Federal Food, Drug, and Cosmetic Act, and that this violation created a rebuttable presumption of negligence. Id. at 805-06, 106 S.Ct. 3229. The Supreme Court concluded that “the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently ‘substantial’ to confer federal-question jurisdiction.” Id. at 814, 106 S.Ct. 3229. In Grable, the Court reiterated this conclusion, pointing out that “if the federal labeling standard without a federal cause of action could get a state claim into federal court, so could any other federal standard without a federal cause of action.” 545 U.S. at 318, 125 S.Ct. 2363 (emphasis added).
This case presents an even more tenuous link to the underlying federal standard. The majority opinion argues that a violation of a stock exchange rule — which is in turn premised on a duty found in the Exchange Act — will be a required element *1045 of UBS’s state law claims. See Op. at 1021-24. In Merrell Dow, the federal issue incorporated into the state law claim was an alleged violation of a federal statute itself. Id. at 805-06, 106 S.Ct. 3229. That federal issue was nevertheless deemed to be insufficiently substantial. Id. at 814, 106 S.Ct. 3229. The case before us does not present a more substantial issue than that in Merrell Dow, let alone one sufficiently substantial to generate federal question jurisdiction.
In short, I would conclude that there is no substantial federal question presented under Barbara, Merrell Dow, and the other Supreme Court precedent in this area.
III. Exercise of federal question jurisdiction over UBS’s state law claims will upset Congressional intent as to the federal-state balance of responsibility.
Finally, this case violates the GrableGunn requirement that the case must be capable of being resolved in a federal court without upsetting the federal-state balance approved by Congress.
The majority’s argument that “the exercise of federal jurisdiction here comports with Congress’s expressed preference for alleged violations of the Exchange Act, and of the rules and regulations promulgated thereunder to be litigated in a federal forum,” is an implausible reading of the Exchange Act. See Op. at 1030. In fact, Congress’s conferral of exclusive federal court jurisdiction for violations of the Exchange Act cuts against the majority’s argument. Congress understood the distinction between violations of federal law and violations of the rules of a stock exchange, and made a deliberate choice to confer exclusive federal court jurisdiction on claims involving the former and not to confer such jurisdiction on claims involving the latter.
Rather, Congress intended that any federal interest implicated in violations of stock exchange rules be vindicated through direct SEC enforcement action. It is curious to suggest that Congress intended that federal interests be vindicated through the indirect means of state law claims that only tangentially implicate federal law.
The majority also fails to adequately address a key concern of this requirement — that permitting traditional state law causes of action, like breach of contract and negligence, into federal court will result in the undesired shift of a “tremendous number of cases” from non-federal forums into federal court. See Grable, 545 U.S. at 318,125 S.Ct. 2363.
A. Congress did not intend for state law claims premised solely on violations of the rules of a stock exchange to be litigated in federal court.
The majority’s reliance on the exclusive jurisdiction provision in the Exchange Act as an indication of Congressional intent is unpersuasive. The “Exchange Act” and “the rules and regulations thereunder” do not include or refer to the rules of a stock exchange. Where Congress wished to refer to the rules of a national securities exchange, it specifically referred to them. Compare 15 U.S.C. § 78aa (providing for exclusive federal court jurisdiction for violations of “violations of this chapter or the rules and regulations thereunder”) with 15 U.S.C. § 78cc(a) (voiding any provision allowing waiver of compliance “with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization ”) (emphasis added); see also, e.g., 15 U.S.C. § 78u(a)(l) (providing that the SEC may investigate whether any person has violated or is violating “any provision of this chapter, the *1046 rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated .... ”) (emphasis added).
Based on the plain text of the statute, we have held that the exclusive jurisdiction provision of the Exchange Act does not confer such jurisdiction on claims based on the rules of a stock exchange: “We think that the quoted language [15 U.S.C. § 78aa] plainly refers to claims created by the Act or by rules promulgated thereunder, but not to claims created by state law.” Barbara, 99 F.3d at 55. In so holding, we foreclosed the contrary determinations of the Fifth and Ninth Circuits that the majority oddly chooses to discuss before conceding that “we declined to adopt such a broad reading of § 78aa.”[3] See Op. at 1030.
Despite acknowledging our contrary precedent, the majority “identif[ies] the jurisdiction grant of § 78aa as a signal that we will not upset the appropriate balance of federal and state judicial responsibilities by exercising federal jurisdiction in this case.” See Op. at 1030. In a conclusory fashion, the majority simply extends principles that apply to federal statutes and regulations to the rules of a stock exchange, without acknowledging that Congress and this Court have found there to be a meaningful distinction between the two. The boundaries of federal jurisdiction are not limitless, and Congress and this Court have drawn that boundary between claims arising from a federal statute or regulation and those arising from the rules of a stock exchange.
Finally, as was made clear in Merrell Dow and reiterated in Grable, the best expression of Congress’s forum preference is found in its decision to create — or, as here, not create — a federal private right of action. See Merrell Dow, 478 U.S. at 812, 106 S.Ct. 3229 (“The significance of the necessary assumption that there is no federal private cause of action thus cannot be overstated.”). Grable reaffirmed and clarified this holding, noting that Merrell Dow viewed the absence of a federal private right of action as an “important clue” to Congressional intent. Grable, 545 U.S. at 318, 125 S.Ct. 2363.
Although the Exchange Act provides for several private causes of action for violations of the Act itself,- see, e.g., 15 U.S.C. § 78r (providing private cause of action for misleading statements made in a registration statement), it is undisputed that the Exchange Act does not provide for a private cause of action for violations of stock exchange rules. The majority confronts this problem only by noting that the existence of a federal private right of action is “relevant to, but not dispositive of’ the question of substantiality. See Op. at 1028. But the majority opinion then treats this admittedly “relevant” consideration as irrelevant, because it provides no further *1047 explanation as to why this particular case warrants such a ready dismissal of the dictates of Merrell Dow.
The Act’s legislative history also makes clear that Congress intended that a stock exchange’s violations of its own rules be addressed through direct SEC enforcement action — not indirectly through private state law claims. See, e.g. S. Rep. 94-75 at 34 (1975) (“Although a wide measure of initiative and responsibility is left with the exchanges, reserved control is in the Commission if the exchanges do not meet their responsibility.”) (emphasis added). To enforce stock exchange rules, the SEC can “censure and place restrictions on the activities, functions, and operations of a self-regulatory agency” or “censure or remove from office any officer or director of a self-regulatory organization who had willfully failed to enforce compliance with the Exchange Act.” Id. The SEC can also bring a direct injunctive action in federal court to “command a member of a self-regulatory organization to comply with the rules of such organization.” Id.
Notably absent from the intended enforcement mechanisms are state law actions premised on stock exchange rules. Indeed, no actor other than the SEC — or a similar regulatory agency — is envisioned as playing a role in the enforcement of those rules. There is therefore no basis for the majority’s conclusion that the exercise of jurisdiction here aligns with Congressional intent concerning the appropriate forum for state law claims premised on stock exchange rules.
B. The majority ignores the “litigation-provoking problem.”
The “balance of federal-state responsibilities” requirement is concerned in large part with upsetting Congressional intent by sweeping a large number of cases into federal court that are only tangentially related to federal interests. This concern has been termed the “litigation-provoking problem.” See Merrell Dow, 478 U.S. at 809-10,106 S.Ct. 3229.
Any expansion of the exercise of federal question jurisdiction over state law claims must be done with a careful eye to the impact of such a holding on the volume of litigation in the federal courts. See Merrell Dow, 478 U.S. at 811, 106 S.Ct. 3229 (expressing concern with the “increased volume of federal litigation” that would result from the exercise of federal question jurisdiction); Grable, 545 U.S. at 319, 125 S.Ct. 2363 (observing that the Supreme Court declined to exercise federal question jurisdiction in Merrell Dow in part because “[a] general rule of exercising federal jurisdiction over state claims resting on federal mislabeling and other statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal courts”).
Such concerns should be at the forefront here. In Grable, the Supreme Court reviewed the facts in Merrell Dow which led to its decision to decline to exercise federal question jurisdiction: there was no federal private cause of action, the federal question at issue was a federal standard incorporated into a state law claim, and other “garden variety” state law actions could have used the same “embedded” federal issue to bring claims in federal court. See 545 U.S. at 318-19, 125 S.Ct. 2363. The confluence of these factors led the Supreme Court to conclude that the exercise of federal question jurisdiction over the state law claim in Merrell Dow “would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues.” Id. at 318,125 S.Ct. 2363.
Those same elements are present here. Although the majority gives the potential “horde of original filings and removal *1048 cases” no attention, it is a real danger, for three reasons: (1) the duty to maintain a fair and orderly market underlies every stock exchange rule; (2) many other federal statutes create a broad duty; and (3) the majority’s opinion will prompt increased litigation even if jurisdiction is ultimately found lacking.
1. Federal question jurisdiction could exist for a state law claim implicating any stock exchange rule violation.
First, because the duty to “maint[ain] a fair and orderly market” underlies every stock exchange rule, any alleged stock exchange rule violation could provide a basis for removal or original filing in federal court. See Op. at 1021 (“ ‘Maintenance of fair and orderly markets’ is the animating goal of federal securities law.”) (citing 15 U.S.C. § 78k-l(a)(l)(C)). This is contrary to the Court’s reasoning in Grable, where the Court observed that “because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor.” Grable, 545 U.S. at 315, 125 S.Ct. 2363. Here, in the majority’s view, every state law claim premised on violations of stock exchange rules “raises a contested matter bf federal law.”
2. The majority’s ruling would apply to numerous other federal statutes.
Though the number of potential suits arising from stock exchange rules is problematic enough, the litigation-provoking problem extends far beyond the context of stock exchange rules. To take one example, many state law claims currently arbitrated by the Financial Industry Regulatory Authority (FINRA) could be swept into federal court. The majority provides no limitation on such an outcome.
FINRA is a self-regulatory organization, like NASDAQ, that is registered with the SEC as a “national securities association.” Federal law requires most securities firms to register with FINRA. See 15 U.S.C. § 78o(b)(ll). Like NASDAQ, FINRA creates and enforces rules that govern the securities industry and those rules must be approved by the SEC. See 15 U.S.C. § 78s(b)(l). FINRA’s rules govern all aspects of securities trading, including, inter alia, securities offerings and underwriting, quotation and trading obligations and practices, handling of customer orders, and margin requirements. See generally FIN-RA Rules 4000-5000.
Like NASDAQ’s Services Agreement, FINRA rules provide that most disputes be resolved in arbitration. See FINRA Rule 12200. Last year, 3,714 arbitration cases were filed with FINRA. See FIN-RA, Dispute Resolution Statistics: Arbitration Cases Filed available at http:// www.finra.org/ArbitrationAndMediation/ FINRADisputeResolution/Additional Resources/Statistics/. From 1999 to 2013, the number of FINRA arbitration cases filed per year has ranged from a low of 3,238 in 2007 to a high of 8,945 in 2003. See id. To put those numbers in perspective, in 2013, 8,574 civil eases were filed in the U.S. District Court for the Southern District of New York. See U.S. Courts, U.S. District Courts — Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2013 available at http://www. uscourts.gov/Viewer.aspx?doc=/uscourts/ Statisties/FederalJudicialCaseload Statistics/2013/tables/C03Marl3.pdf.
And those are only the cases that could be shifted from FINRA arbitration. As Judge Friendly once observed, “stock exchanges ... [are] but one of many instanc *1049 es where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes.” Cf. United States v. Solomon, 509 F.2d 863, 869 (2d Cir.1975). He pointed out that many heavily-regulated industries are responsible for self-regulation, including “boards of trade,” which are responsible for self-policing under the Commodity Exchange Act, and “[a]irline and steamship conferences,” which employ “elaborate enforcement machinery” to police regulatory violations. Id. The potential number of suits that could be filed in, or removed to, the district courts of this Circuit on the basis of the majority’s uncabined holding is therefore problematic.
3. The majority’s opinion will prompt litigation even where federal jurisdiction is ultimately found lacking.
The majority avers, in conclusory fashion, that the exercise of such jurisdiction will be rare. See Op. at 1029 (“[Ajfter such careful, case-specific consideration, most federal law questions raised in connection with state law claims will not be deemed substantial”). Even if that were true, Grable makes clear that the relevant test is not concerned solely with the eventual decision to exercise or decline jurisdiction, but with the increased volume of litigation itself. Grable noted that the Court declined to exercise jurisdiction in Merrell Dow in part because it “would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues.” 545 U.S. at 318,125 S.Ct. 2363.
The majority’s opinion provides no clear jurisdictional limitation to a party with a state law claim based on a violation of a rule even remotely related to federal law. Even if the majority does not significantly move the line where we exercise federal jurisdiction, the majority makes the line murky enough to invite the horde of cases that the Court was concerned about in Grable and Merrell Dow.
The Supreme Court has indicated that, where federal question jurisdiction would result in a large number of state law claims shifted from other forums to federal court, those state law claims do not fall within the “special and small” category of state law claims over which we can exercise federal question jurisdiction. See Grable, .545 U.S. at 318, 125 S.Ct. 2363; Merrell Dow, 478 U.S. at 811, 106 S.Ct. 3229. We should heed the Supreme Court, and recognize that the exercise of Grable-Gunn jurisdiction here would upset the balance of federal-state responsibility.
C. No federal forum is required to vindicate a federal interest.
We need not turn somersaults to exercise this exceptional category of federal question jurisdiction, because no federal forum is required to vindicate any federal interest here. To the extent there is a federal interest at stake, it has already been vindicated by the SEC’s investigation and sanction of NASDAQ. See SEC Release No. 31-69655, 2013 WL 2326683 (“S.E.C. Release.”). Any tangential federal interest present in UBS’s state law claims can be adjudicated in a non-federal forum without doing damage to the federal system.
The Supreme Court has found reason to exercise federal question jurisdiction over the rare category of cases where a state law claim challenges federal agency action and the government “has a direct interest in the availability of a federal forum to vindicate its own administrative action.” Grable, 545 U.S. at 315, 125 S.Ct. 2363. Here, the SEC has already vindicated the government’s interest by instituting and concluding its own administrative proceed *1050 ings. See SEC Release, at *1; see also Op. at 1015. In a lengthy Release, the SEC found that NASDAQ had failed to comply with several of its own rules, set forth remedial actions to be taken — including the amendment of certain NASDAQ rules — and imposed sanctions. See SEC Release, at *13-17.
In any event, the SEC always has a federal forum available if it wishes to pursue litigation concerning the NASDAQ rules. The Exchange Act specifically provides that the Commission may bring an injunctive action in federal court against any person or entity it believes to be violating the provisions of the Exchange Act, any rules or regulations promulgated thereunder, or “the rules of a national securities exchange.” 15 U.S.C. § 78u(d)(l). Congress therefore intended that any federal interest at issue be vindicated — not through the inefficient and indirect means of a state law claim based on a violation of a stock exchange rule — but through direct SEC enforcement action.
The Supreme Court has confirmed that federal courts should not exercise federal question jurisdiction over state law claims if those claims can be competently adjudicated in a non-federal forum. In Gunn, the Supreme Court rejected the suggestion that a state law malpractice claim premised on a patent law question was entitled to federal court jurisdiction on the basis of federal court expertise: “Nor can we accept the suggestion that the federal courts’ greater familiarity with patent law means that legal malpractice cases like this one belong in federal court.” 133 S.Ct. at 1068. Likewise in Empire Healthchoice — where a health insurance carrier for federal employees filed a reimbursement action against the insured’s estate — the Court declined to exercise federal question jurisdiction in part because “it is hardly apparent why a proper ‘federal-state balance’ would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum.” 547 U.S. at 701, 126 S.Ct. 2121 (internal citation omitted). The Court observed that “[t]he state court in which the personal-injury suit was lodged is competent to apply federal law, to the extent it is relevant.” Id.
Non-federal forums are presumptively competent to adjudicate state law claims— even those that tangentially concern federal law.[4] See Gunn, 133 S.Ct. at 1067; Empire Healthchoice, 547 U.S. at 701, 126 S.Ct. 2121. The state law claims at issue, while perhaps complicated and potentially worth a great deal of money, are not unlike any number of other complex contract and negligence claims competently adjudicated in state court or arbitration forums.
Finally, the majority opinion appeals to the need for “uniformity” in the adjudication of “an exchange’s performance of specified Exchange duties.” Op. at 1031. As noted above, no provision of the Exchange Act requires interpretation or application here. And to the extent that the Exchange Act is implicated in a state law claim, the most efficient and direct way for the federal courts to ensure uniformity of federal law is to interpret or construe any federal law dispute in the context of a direct SEC enforcement action.
“[Ajllowing state courts to resolve these cases” will not “undermine the develop *1051 ment of a uniform body of [securities] law.” Cf. Gunn, 133 S.Ct. at 1067. Congress has already ensured a uniform body of securities laws “by vesting exclusive jurisdiction over actual [securities] cases in the federal district courts.” Cf. id.
Uniformity will also remain undisturbed because federal courts have exclusive jurisdiction over cases involving actual violations of the Exchange Act. And the adjudication of this case by an arbitration panel or state court will be non-binding on federal courts. See id.; TaffLin v. Levitt, 493 U.S. 455, 465, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (rejecting the argument that state courts should not adjudicate civil RICO claims because “federal courts ... would retain full authority and responsibility for the interpretation and application of federal criminal law, for they would not be bound by state court interpretations of the federal offenses constituting RICO’s predicate acts”). There is no special need for a federal court to resolve these state law claims.
CONCLUSION
The majority opinion expands our jurisdiction beyond its permissible bounds. In doing so, it ignores or misreads controlling precedent from the Supreme Court and this Circuit. I dissent.

. The majority characterizes a stock exchange’s duty to provide for a fair and orderly public stock offering as "the” core duty of a stock exchange. Op. at 1048. There is no basis for the conclusion that this duty is paramount, or even more significant than any of the other core functions performed by a stock exchange. Indeed, the SEC Release cited by the majority identifies "the orderly initiation of secondary market trading after an IPO” as only "one of the” core functions of a stock exchange. See id.; see also discussion infra at 1040-41 (noting that the Exchange Act focuses much more particularly on the duty to discipline members than on any duty to administrate a public offering).

. It appears that the exchange summarily suspended Barbara pursuant to 15 U.S.C. § 78f(c)(3), and an "Acceptability Committee” later determined that Barbara should have been given a disciplinary hearing pursuant to 15 U.S.C. § 78f(c)(l)-(2). See Barbara, 1995 WL 221487, at *1, 5 (noting that the stock exchange did not misuse its "Acceptability Hearing and summary suspension procedures”).

. Other Circuits are in accord with our holding that the exclusive jurisdiction provision of the Exchange Act does not apply to stock exchange rules. See Karsner v. Lothian, 532 F.3d 876, 887 (D.C.Cir.2008) ("Moreover, although the NASD Rules require SEC approval, the Rules do not come within the meaning of 15 U.S.C. § 78aa which gives a federal court 'exclusive jurisdiction of violations’ of rules and regulations promulgated under the Securities Exchange Act of 1934.”) (internal citation omitted); Ford v. Hamilton Investments, Inc., 29 F.3d 255, 259 (6th Cir.1994) ("A breach of the NASD rules does not present a question that arises under the laws of the United States within the meaning of 28 U.S.C. § 1331, and it follows a fortiori that compliance with NASD rules does not give rise to federal question jurisdiction.”) (internal citation omitted). The National Association of Securities Dealers ("NASD”) was a self-regulatory organization and precursor to NASDAQ.

. Indeed, state courts are presumed competent to adjudicate any federal cause of action that has not been exclusively diverted to federal court. See Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820, 823, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) ("Under our system ed dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.”) (quotation marks omitted).